**UNITED COMPANIES LENDING CORPORATION, Plaintiff,**

v.

**Daisy F. SARGEANT, Individually, and on behalf of all persons similarly situated, Defendants.**

No. CIV.A. 96–12538–WGY.

United States District Court, D. Massachusetts.

Sept. 11, 1998.

Steven E. Snow, Partridge, Snow & Hahn, Providence, RI, for United Companies Lending Corp.

Andrew Troop, Gordon M. Jones, III, Hutchins, Wheeler & Dittmar, Boston, MA, for Daisy F. Sargeant.

Jeffrey D. Clements, Office of the Atty. Gen., Pamela Kogut, Asst. Attys. Gen., Consumer Protection and Antitrust Div., Boston, MA, for Com. of Mass.

### *MEMORANDUM AND ORDER*

YOUNG, District Judge.

This case comes before the Court as a case stated. That is, the parties have stipulated to all material facts and it remains for this Court to review the record, draw such inferences as are reasonable and, applying the governing law, enter such judgment as may be appropriate. *See Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.,* 972 F.2d 426, 429 n. 7 (1st Cir.1992) (noting that the submission of a matter to the court as a case stated increases judicial efficiency); *Boston Five Cents Savings Bank v. Secretary of Department of Housing and Urban Dev.,* 768 F.2d 5, 12 (1st Cir.1985) (same). This procedural device is especially appropriate when the Court is faced with cross motions for summary judgment. The advantage of the case stated procedural device, of course, is that the Court need not draw all inferences against each moving party but, with the entire case stated before it, may instead draw such inferences as are reasonable to resolve the case. A joint statement of undisputed facts ("Joint Statement") has been submitted by the parties. The Court draws from it the factual recitation below.

## I. BACKGROUND

United Companies Lending Corporation ("United") makes, sells, and services refinancing, first lien residential mortgage loans which are used primarily for debt consolidation, home improvement, or major household purchases. Joint Stmt. Undisputed Facts ¶ 1. United is licensed to do business in Massachusetts as a mortgage lender. Stipulated Ex. 9. United operates in the subprime market making loans to consumers who have a higher credit risk than borrowers in the prime market.

Subprime loans are more costly to the lender to originate, sell, and service than traditional "A credit" loans. Joint Stmt. ¶ 5. In the subprime market, the lenders evaluate the credit-worthiness of a borrower "by establishing various risk classifications with associated pricing parameters." Joint Stmt. ¶ 3. There is no standard set of credit risk assessment criteria as exists in the prime market. The subprime market typically takes into consideration a potential borrower's 1) credit history; 2) the household debt-to-income ratio if the loan is approved; and 3) the combined loan-to-value ratio for home equity loan and other mortgage debt on the property. "Standards vary, however, within the subprime market, and different lenders may assign different weights for each of these factors, for a given credit grade. (One firm's 'B' loans may look like another firm's 'C' loans.)" Joint Stmt. ¶ 4.

Subprime loans have higher securitization costs associated with the sale of these loans on the private secondary market compared to loans in the prime market because they are "nonconforming" loans. United loans are also sold "with recourse" in the event of a default by the borrower. As a result of these terms, the risk to the lender on a subprime loan is substantially higher than on a prime loan. "Due to the higher risks and costs associated with subprime loans, the total cost of such loans to the borrower—as reflected in the Annual Percentage Rate ("APR")—is generally higher than the cost of loans by traditional lenders such as banks. Such costs typically include interest, origination

fees or 'points' and other fees associated with the closing of the loan." Joint Stmt. ¶ 9.

Daisy Sargeant ("Sargeant") is the owner of a New England triple-decker in Dorchester, Massachusetts. She resides on the second floor and rents out the first floor and third floor apartments for $600.00 per month each. Desiring to make improvements to the interior and the exterior of the house, she responded to an advertisement in the *Boston Herald* regarding the availability of loans. She contacted the toll-free number in the advertisement and received a mortgage application. The advertisement was placed by a California-based mortgage broker, John P. McIntyre ("McIntyre"). McIntyre referred Sargeant's name to David Richard ("Richard"), a United mortgage loan originator located at the Warwick, Rhode Island office. Richard contacted Sargeant. Richard is the United agent with whom Sargeant dealt in obtaining the mortgage loan at issue.

On August 9, 1995, Sargeant completed the loan application and executed disclosure documents related to the loan. Joint Stmt. ¶ 21; Stipulated Ex. 1–10. Sargeant was classified as a "C" borrower by United. Joint Stmt. ¶ 33. On August 23, 1995, United approved Sargeant's loan. A title search disclosed an undischarged mortgage on the property, however, as well as unpaid real estate taxes. United states that McIntyre negotiated with the lien holder who agreed to accept $5000 as payment in full. United reapproved the loan, and the closing was held in Warwick, Rhode Island, on September 29, 1995. Closing Documents as Exhibits 14–45.

Sargeant thus obtained a loan from United for $134,700. The mortgage had an adjustable interest rate with an initial rate of interest of 10.99%. The loan provided that the rate could be adjusted upward one percent every six months with a maximum interest rate of 16.99%. The initial annual percentage rate charged on the mortgage was 13.556%. The loan proceeds were disbursed as follows: $15,681 was applied to the home improvements upon their completion; $4,910 was applied to pay off credit card debt; and $93,000 was applied to two prior mortgages on her residence.[1] According to the settlement

---

1. One of the mortgages totaled $88,000 to AFSCI and the other totaled $5,000 to Foremost Servic-

statement, Sargeant was assessed a brokerage fee payable to United in the sum of $13,461.40. United claims that this entry is incorrect and that the $13,461.40 was paid to United as an origination fee or "points." Sargeant was also charged a broker's fee in the amount of $4,150 made payable to McIntyre. Her total closing costs and fees equaled $23,029.87. Her initial mortgage payments were $1,281. Her previous mortgage payments were $956 per month.

Sargeant fell behind in the repayment of her loan and United initiated foreclosure proceedings against her. Joint Stmt. ¶ 34. Sargeant then filed a consumer complaint with the Consumer Protection and Antitrust Division of the Massachusetts Attorney General's Office. *Id.*

After the filing of this Complaint, the Attorney General, on behalf of the Commonwealth of Massachusetts, commenced an action against United in the Massachusetts Superior Court sitting in and for the county of Suffolk seeking, *inter alia,* to enjoin United 1) from making any mortgage loans in violation of Mass. Gen. Laws ch. 184, § 17D and the Mortgage Brokers and Mortgage Lenders Regulations of the Attorney General, 940 C.M.R. § 8.00 *et seq.,* and 2) from making any mortgage loans in violation of Mass. Gen. Laws ch. 183, § 63. A preliminary injunction issued in that case on January 24, 1997, prohibiting United from taking any further action in foreclosing on Sargeant's property and requiring it to notify the Commonwealth thirty days prior to a foreclosure sale on any other residential property. *See Commonwealth of Massachusetts v. United Cos. Lending Corp.,* Civil Action No. 96–7070–F.

At this point, United went forum shopping. *Cf. Coady v. Ashcraft & Gerel,* 996 F.Supp. 95, 98–99 (D.Mass.1998). It commenced this defendant class action suit against Daisy Sargeant and all persons similarly situated, seeking a declaratory judgment that 940 C.M.R. § 8.06(6) is void and unenforceable, that the mortgage loan origination fee or points charged to Sargeant were lawful and proper, and that a judgment of default

against Sargeant on the mortgage note was therefore appropriate. Sargeant counterclaimed, asking for a declaration that the mortgage transaction was an unfair or deceptive act because it was unconscionable pursuant to 940 C.M.R. § 8.06(6), and that rescission of the mortgage loan is therefore permissible.

United has properly invoked the diversity jurisdiction of this Court. Moreover, due to this Court's currently low caseload, I believed I might more speedily address the merits than my equally competent but extremely overworked Superior Court colleague. Accordingly, I first tried to invite the Massachusetts Attorney General to join in this litigation so that a single lawsuit could resolve all matters. He declined, properly citing his preference for the litigation he had commenced in the Massachusetts Superior court and the Eleventh Amendment bar to requiring him to litigate in this forum. I next tried to coordinate this case with its Superior Court counterpart, suggesting a joint hearing to obviate the risk of inconsistent decisions and offering this session's computer-integrated courtroom as a possible site. *See* letter of May 21, 1997, from Hon. William G. Young to Hon. Thayer Fremont–Smith. The Attorney General would have none of it.

Ultimately, this Court held that the Massachusetts Attorney General was not an indispensable party, that the *Burford* abstention doctrine did not require this Court to abstain from exercising its jurisdiction over this matter, and that the Court would not decline to exercise jurisdiction under the Declaratory Judgment Act. *See* Order dated May 8, 1997.

The federal action thus went forward, the parties falling to with a will, promptly filing cross motions for summary judgment and, after a case management conference, a joint statement of facts on which the case can be decided. The Court heard oral arguments from the parties on October 23, 1997. Apparently, no further action of a substantive nature has occurred in the Superior Court, thus effectively sidelining the Massachusetts

ing Company, Inc. Sargeant claims that she was not making any payments in connection with the

$5,000 mortgage and alleges that she did not have any obligation to do so.

Attorney General in this important litigation concerning the reach of its regulatory powers.[2]

## II. DISCUSSION

Pursuant to his authority under the Massachusetts General Laws, the Attorney General has the authority to make rules and regulations interpreting what acts or practices by mortgage lenders and brokers are unfair or deceptive and, therefore, illegal under Mass. Gen. Laws ch. 93A, § 2(a). *See* Mass. Gen. Laws ch. 93A, § 2(c). "Such rules and regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the federal courts interpreting the provisions of 15 U.S.C. 45(a)(1)." *Id.* Whether the Attorney General has acted within the confines of such authority in the promulgation of a regulation thus requires this Court to make two sequential assessments. First, is the regulation consistent with the decisions of the Federal Trade Commission and the federal courts interpreting 15 U.S.C. 45(a)(1)? If so, is the Regulation arbitrary, capricious, or manifestly contrary to the state statute?[3]

Here, the Attorney General has promulgated regulations governing the activities of mortgage brokers and mortgage lenders which apply to "any mortgage lender or broker advertising or doing business within Massachusetts, regardless of whether or not the lender or broker maintains an office in Massachusetts." 940 C.M.R. 8.02. Regulation 8.06(6) ("the Regulation"), which became effective August 1, 1992, states that:

> It is an unfair or deceptive practice for a mortgage broker or lender to procure or negotiate for a borrower a mortgage loan with rates or terms which *significantly deviate from industry-wide standards* or which are *otherwise unconscionable.* (emphasis added).

**2.** It does appear that the case is advancing procedurally, the parties having been ordered to appear for a pre-trial conference on October 1, 1998.

**3.** In reviewing an agency's construction of a statute which it administers, courts must give deference to the agency's interpretation:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of

This is the regulation that United challenges in this case.

## A. CONSISTENCY WITH LEGISLATIVE INTENT

■ United first advances a theory of implied repeal, asserting that this regulation is void because it is inconsistent and incompatible with the express policy of the legislature. United argues that Mass. Gen. Laws ch. 183, § 63 reflects a legislative determination that mortgage loan origination fees should be established by competitive market forces rather than regulation. This statute (the "Points Statute") deals with loan fees for residential property mortgages. Prior to 1994, the Points Statute had a restrictive provision which prohibited the charging of points in a residential mortgage transaction except for reasonable originating expenses and for commitment fees. In that year, however, the Massachusetts Legislature amended Mass. Gen. Laws ch. 183, § 63, substituting a more liberal provision permitting the charging of such fees provided that prior written disclosure is made to the mortgagor.

The old Points Statute provided in relevant part:

> A mortgagee **shall not charge** a loan fee, finder's fee, points, so called, or similar fees in a mortgage transaction involving a residential property located in the commonwealth of four or less units and occupied or to be occupied in whole or in part by the mortgagor, *except to the extent such fees or points constitute reimbursement for reasonable originating or underwriting expenses, as determined by the commissioner, incurred by the mortgagee and reimbursement for any commitment or other fees paid or to be paid by the mortgagee for the intended purposes of selling*

authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnote omitted).

*mortgage loans in the secondary mortgage market.*

1980 Mass. Acts c. 385 (as amended by 1986 Mass. Acts c. 25).

The new Points Statute states in relevant part:

A mortgagee, or a mortgage lender or mortgage broker **shall not charge** a loan fee, finder's fee, points, so-called, or similar fees in a mortgage transaction involving residential property located in the commonwealth of four or less units and occupied in whole or in part by the mortgagor, *except to the extent that such fees or points have been previously disclosed to the mortgagor in writing* .... A mortgagor shall not be obligated to pay fees or points which have not been previously disclosed as required herein.

1994 Mass. Acts c. 245.

United argues that the Attorney General's 1992 Regulation implicitly was repealed by the amendment to the Points Statute, as the new statutory language expresses a legislative intent that the appropriate loan fee or points be determined by the market. United asserts that the prohibitions contained within the Regulation run counter to this intent, because they impose a restriction on the points charged. United offers no legislative history to support its interpretation of the legislative intent. United does advert to the August 26, 1996 rescission of the Banking Commissioner's directive limiting the number of points that could be charged. Also, United cites a letter from the Commissioner of Banking to Chief Executive Officers of financial institutions dated February 6, 1995 ("Commissioner Letter") to support its claim that one of the purposes of the amendment was to remove the barrier to subprime lending caused by the loan fee restrictions.

In the Commissioner Letter, however, the Banking Commissioner states:

The new statute does not limit the amount of points and fees charged to consumers as long as they are properly disclosed. Chapter 245, however, is not an outright repeal of the point statute and lenders are cautioned against proceeding on that assumption.... Lenders should recognize that 'points' are not unlimited even after Chapter 245. Consumer refunds may be required for undisclosed, improperly disclosed or "unconscionable" fees under any of these provisions.

Thus, to the extent that the Commissioner Letter can provide insight into legislative intent, as United asserts, it indicates an intent to ensure that the points charged are not undisclosed or unconscionable. In fact, the Commissioner Letter indicates that the Banking Commissioner believed that the Regulation would still be applicable to the banking industry, as it goes on to state:

The Division's examiners also will be monitoring compliance with the disclosure provisions of Chapter 245 as part of our ongoing Mortgage Lender and Broker and Consumer Compliance examination programs. Examiners will be instructed to review compliance with the consumer disclosure provisions of Chapter 245; Truth–in–Lending's APR calculation and disclosure provisions; the "unconscionable" fee provisions of the Attorney General's Mortgage Broker and Mortgage Lender Regulations (see 940 C.M.R. 8.06(6)), as well as the "high rate-high fee" loan amendments of Regulation Z mandated under the Home Ownership and Equity Protection Act of 1994.

The Regulation, consistent with the Attorney General's rule-making authority, provides a basis for interpreting whether the charging of points is an unfair or deceptive practice. This is not counter to objectives of the new Points Statute. The new Points Statute operates within the more general context of Massachusetts law concerning unfair or deceptive commerce practices and federal Truth–in–Lending laws, not in a vacuum. As United puts forth no substantive evidence of a legislative intent to repeal the Regulation and the Regulation is neither repugnant to nor inconsistent with the new Points Statute, *see St. Germaine v. Pendergast*, 411 Mass. 615, 626, 584 N.E.2d 611 (1992), its argument fails.

The fact that the charging of points is permissible where there is disclosure, without requiring the direct correlation between the amount charged and the services ren-

dered, does not imply that such points may be charged without limit or that the charging of certain points does not constitute an unfair act. The Attorney General's regulations may proscribe even good faith business practices that could be unfair or deceptive. *See Maillet v. ATF–Davidson Co., Inc.,* 407 Mass. 185, 193, 552 N.E.2d 95 (1990); *Purity Supreme, Inc. v. Attorney General,* 380 Mass. 762, 779–80, 407 N.E.2d 297 (1980). The Regulation does not prevent the charging of points but, instead, furthers the underlying policy of Chapter 93A "to ensure an equitable relationship between consumers and persons engaged in business." *Heller v. Silverbranch Constr. Corp.,* 376 Mass. 621, 624, 382 N.E.2d 1065 (1978). The authorization of a particular act or practice by statute—here, the charging of points on a residential mortgage—does not mean that certain extreme applications of such practice may not be found unfair or deceptive. *See DiMarzo v. American Mutual Ins. Co.,* 389 Mass. 85, 96, 449 N.E.2d 1189 (1983). The Regulation is not out of harmony with the legislative intent related to the enactment of the new Points Statute. In fact, the history surrounding its promulgation reflects the fact that competitive market forces were not ensuring fair origination fees but instead, due to market failure, widespread mortgage lending abuses were present in Massachusetts. *See, e.g.,* Attorney General of Massachusetts, *A Special Report on the Attorney General's Response to the Home Improvement and Mortgage Scams in Massachusetts: Enforcement, Legislation, and Regulation* (1992), *reprinted in Problems in Community Development Banking, Mortgage Lending Discrimination, Reverse Redlining, and Home Equity Lending Before Comm. on Banking, Hous., and Urban Affairs,* 103d Cong. 307–08 (1993).

In sum, the Regulation does not contravene the present legislative intent.

## B. CONSISTENCY WITH APPLICABLE FEDERAL LAW

Having concluded that the Regulation is in force, the Court must now consider whether it is void. United argues that the Regulation is void because the definition of unfair or deceptive practice as defined by the Regulation is inconsistent with the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting the provisions of 15 U.S.C. § 45(a)(1).

In 1964, the Federal Trade Commission issued a policy statement articulating a three-prong test for whether a practice is unfair or deceptive. *See* Federal Trade Commission, *Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking,* 29 Fed.Reg. 8324, 8355 (1964). This test was approved by the Supreme Court in *Federal Trade Comm. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972), and subsequently has been dubbed the "S & H test." The three-prong S & H test considers whether a practice 1) causes substantial injury to consumers, 2) violates established public policy, or 3) is immoral, unethical, oppressive, or unscrupulous. *See id.*

In December, 1980, in response to congressional inquiry concerning the scope of the Federal Trade Commission's unfairness jurisdiction under 15 U.S.C. § 45(a)(1), the Commissioners submitted to Congress a policy statement on the definition of consumer unfairness in order "to provide a greater sense of certainty about what the Commission would regard as an unfair act or practice under [15 U.S.C. § 45(a)(1) ]." Letter from the Federal Trade Commission to the Honorable Wendell H. Ford and the Honorable John C. Danforth (Dec. 17, 1980) *reprinted in* H.R.Rep. No. 156, Pt. 1, 98th Cong. 34 (1983) ("Policy Statement").

The Policy Statement provides "a more detailed sense of both the definition and limits of [the S & H test]." Policy Stmt. at 36. First, it gives greater clarification to the consumer injury portion of the test. Consumer injury is substantial when 1) the harm is neither trivial nor merely speculative and, generally, involves monetary harm; 2) the injury is not outweighed by countervailing consumer or competitive benefits of the practice; 3) the injury is not reasonably avoidable by a consumer. *See id.* at 36–38.

The second part of the S & H test—violation of an established public policy—is reaffirmed in the Policy Statement. The public policy prong of the S & H test is often used as additional evidence to determine the extent of consumer injury caused. Language in the Policy Statement suggests that, in some circumstances, violation of an established public policy alone could be sufficient to validate agency action. "[T]he Commission wishes to emphasize the importance of examining outside statutory policies and established judicial principles for assistance in helping the agency ascertain whether a particular form of conduct does in fact tend to harm consumers.... [W]henever objective evidence of consumer injury is difficult to obtain, the need to identify and assess all relevant public policies assumes increased importance. Sometimes public policy will independently support a Commission action." Policy Stmt. at 38–40. The subsequent articulation of the FTC unfairness test indicates that the public policy prong is supplemental to the consumer injury prong and not independent of it. *See* Federal Trade Commission, *Credit Practices Rule Statement of Basis and Purpose and Regulatory Analysis*, 49 Fed.Reg. 7740, 7743 (1984) ("Credit Practices Statement"). "Consumer injury is the central element of any inquiry regarding unfairness." *Id.*

The third prong of the S & H test—unethical or unscrupulous conduct—is abandoned in the Policy Statement as the Commissioners deemed this prong to be duplicative. "Conduct that is truly unethical or unscrupulous will almost always injure consumers or violate public policy as well. The Commission has therefore never relied on the third element of S & H as an independent basis for finding of unfairness, and it will act in the future only on the basis of the first two." Policy Stmt. at 40. The S & H test, as revised and articulated in the Policy Statement and the Credit Practices Rule Statement, is applicable here. *See, e.g., American Financial Services Association v. Federal Trade Commission*, 767 F.2d 957 (D.C.Cir.1985), *cert. denied* 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986).

■ In this case, the consumer injury at issue is a monetary harm. The Attorney General's Regulation attempts to prevent the charging of excessive origination fees or points in residential mortgage loan transactions which increase the debt obligation of the consumer and the potential for default. United argues that a limitation on the permissible origination fee or points charged would cause United either to charge a higher interest rate, thus increasing the cost of the loan to the consumer, or to withdraw from the Massachusetts mortgage market altogether, with the consequence that consumers like Sargeant could not obtain the loans and necessary credit to "get back on their feet." United argues that this cost outweighs the benefits of the Regulation and that the Regulation is thus inconsistent with the applicable Federal law. This Court disagrees.

Evidence in the record indicates that in 1995, the period when the loan transaction took place, the majority of subprime lenders did not charge ten points on loans but rather charged five points or less. Aff. Dupont at ¶¶ 9–11. The payment of points can result in a lower contract rate, but the payment of points does increase the annual percentage rate or the effective rate of interest. This is so because the debt service is based on the face amount of the loan rather than on the net amount of the loan or the amount actually received by the buyer. Thus, contrary to United's assertion, points do not reduce the annual percentage rate but increase it. Points have the effect of reducing the amount of money advanced by the lender while raising the effective interest rate. Although points may be necessary to raise the loan yield in order to obtain a return that is competitive with other types of loans, a twofold increase above the average points charged by subprime market lenders is not necessary to achieve this objective, especially when the mortgage loan is an adjustable rate mortgage as opposed to a fixed mortgage.

United avers that market forces will ensure fairness in mortgage broker and lending practices and, without discussing the public policy issues that surrounded the enactment of the Regulation, argues that the present public policy as articulated by the Massachu-

setts legislature in the amendment of the Points Statute indicates that "restrictions on the amount of points which may be charged are no longer considered necessary." Plt.'s Mem. at 10.

The economic circumstances surrounding the enactment of the Regulation establish the fallacy of this argument. With the abandonment of the inner-city neighborhoods by mainstream lending institutions during the 1970s and 1980s, the deregulation of the banking industry, the appreciation of real estate values in Massachusetts, and the rise of secondary mortgage market, the groundwork was laid for the lending practices that fueled the home improvement and second mortgage lending scams of the 1980s and early 1990s. *See Problems in Community Development Banking* at 253–56 (statement of Scott Harshbarger, Attorney General of Massachusetts); *id.* at 255–57 (statement of Kathleen Keest, National Consumer Law Center, Boston, Massachusetts). At the beginning of the 1980s, home equity financing was not a widely available credit device, but by the end of the decade it had become a common credit device offered by most banks and savings and loans. *See* Julia Patterson Forrester, *Mortgaging the American Dream: A Critical Evaluation of the Federal Government's Promotion of Home Equity Financing,* 69 Tul. L.Rev. 373, 379 n. 34 (Dec.1994) (citing U.S. General Accounting Office, *Tax Policy: Many Factors Contributed to the Growth in Home Equity Financing In The 1980s* 3, 17 [1993] ).[4] The new credit device was not without flaws, as the increase in home equity financing was paralleled by an increase in foreclosures. *Id* . at 381–82 & n. 38. Some of these foreclosures were precipitated by the unscrupulous behavior of unregulated mortgage brokers and lenders who engaged in predatory lending practices that included offering high-rate and high-fee loans to borrowers who lacked access to mainstream banks because of redlining practices, had marginal credit histories, and had limited financial sophistication.

The targets of predatory lenders are usually people who have substantial equity in their homes due to rising real estate values or due to the reduction of purchase money debt, but who are short on cash because of their low or fixed incomes. They may need money to make home repairs or improvements, to pay for necessities such as medical care, or to consolidate household debts. These homeowners generally do not obtain home equity loans primarily for their tax advantages but because borrowing against their homes is the only way that they can obtain the credit they need to make home repairs or to survive periods of economic distress. Those most often affected are minorities, the elderly, and the inner-city and rural poor.

*Id.* at 387–89.

Such were the findings of the Massachusetts' Attorney General's Home Improvement and Mortgage Task Force ("Task Force"). Organized in July 1991, in response to a growing number of citizen complaints regarding home improvement and mortgage lending scams and a *Boston Globe* Special Report on the subject, the Task Force engaged in an 18–month investigation of home improvement and mortgage scams in Massachusetts. In its report, issued on October 30, 1992, the Task Force stated that "[t]hose hardest hit by these scams were the elderly, those already in financial distress, those unsophisticated in financial transactions, communities of color and others, who while income poor or on fixed incomes, had built-up significant equity in their homes." *Special Report* at 308. In the face of these lending practices and its destabilizing impact on "the social fabric of a community," *id.,* the Attorney General promulgated new consumer protection regulations "to protect Massachusetts consumers seeking residential mortgage loans for home improvements and other purposes ... and to ensure that the mortgage industry is operating fairly and honestly by means of legitimate and responsible business acts and practices that are neither unfair nor deceptive." 940 C.M.R. § 8.01; *see also Special Report* at 311.

---

**4.** Home equity indebtedness rose $59 billion in 1981 to $225 billion in 1991. *See* Forrester, *supra,* at 379 n. 32 (citing *GAO Report* at 8).

Redlining and reverse redlining[5] by banks, savings and loans, finance companies, and second mortgage companies impede the self-correcting elements of the market, rendering it unable to prevent consumer injury. This market failure prevents the borrower from taking action reasonably to avoid the financial pitfalls created by predatory lending. Mortgage lending practices in Massachusetts during the eighties and early nineties represented an instance of market failure. Government intervention to address this failing was appropriate. *See American Fin. Servs.*, 767 F.2d at 976.

The Mortgage Brokers and Mortgage Lenders regulations apply only to closed-end, nonpurchase money mortgages. The regulation at issue in this case deals with regulating the rates and terms of these mortgages. By requiring the rates and terms offered reasonably to be within the range for the mortgage lending industry, the Attorney General is ensuring that mortgage companies cannot exploit the lack of access of low-income individuals, the elderly, and communities of color to mainstream banking institutions. In essence, the Regulation prevents lenders from exploiting the financial vacuum created by redlining. Indeed, the Regulation at issue here attempts to minimize government interference with market forces by providing a fluid standard for determining the fairness of particular rates and terms. Only when the competitive forces of the market do not operate to regulate lender behavior does the hand of government bear down.

Mortgage scams and predatory lending are most common in those states lacking sufficient legal and regulatory structures.[6] *See Problems in Community Development Banking* at 315 (statement of Keest). Until the promulgation of the Mortgage Brokers and Mortgage Lenders Regulations, Massachusetts was such a jurisdiction as the Attorney General's Report on Home Improvement and Mortgage Scams revealed. Blind reliance on market efficiency to ensure that business practices are not unfair potentially writes the unfairness element out of 45 U.S.C. § 15(a)(1) and, as a result, out of Mass. Gen. Laws ch. 93A, § 2(a). While it is true that informed consumer choice is the most effective mechanism for regulating the market, this self-correcting mechanism is impaired where the behavior of the seller unreasonably creates or takes advantage of barriers to the free exercise of consumer choice.

The failure of the mortgage lending market to self-correct means injury to the borrower was not reasonably avoidable. United emphasizes the negotiability of the points and interest rates offered in a mortgage to support its position that the Regulation is

---

**5.** Redlining is the practice of denying the extension of credit to specific geographic areas due to the income, race, or ethnicity of its residents. The term was derived from the actual practice of drawing a red line around certain areas in which credit would be denied. Reverse redlining is the practice of extending credit on unfair terms to those same communities. *See* S.Rep. No. 103–169, at 21 (1993), *reprinted in* 1994 U.S.C.C.A.N. 1881, 1905; *see also Reverse Redlining: Problems in Home Equity Lending Before the Senate Committee on Banking, Housing, and Urban Affairs*, 103rd Cong. 243–471 (1993).

**6.** The home improvement and second mortgage scams that proliferated in many communities throughout the country, including Massachusetts' low-income neighborhoods and communities of color like Roxbury, Dorchester, and Mattapan, revealed to both state and federal legislators and regulators that industry regulation was necessary. It was in the aftermath of mounting citizen complaints, journalistic investigations, and agency litigation that the state legislature and the Attorney General's office enacted statutes and regulations to address the unfair and deceptive business practices of mortgage brokers and lenders that had caused numerous foreclosures and financial and community destabilization.

Congress's enactment of the Home Ownership and Equity Protection Act of 1994, Pub.L. No. 103–325, Title I, Subtitle B, 108 Stat. 2190, indicates congressional determination that the type of disclosures required under the Truth in Lending Act (TILA), and applicable to the mortgage in this case, were insufficient to ensure adequate notification of the consumer of the financial ramifications of high-cost, nonpurchase money mortgages. A high cost mortgage is a nonpurchase money mortgage where the initial annual percentage rate exceeds the yield on Treasury securities with the same maturity by 10 percentage points or where the total points and fees payable by the borrower exceed 8% of the total loan amount or $400. The Act reveals congressional awareness that unscrupulous lending practices exist despite TILA provisions and necessitate further governmental oversight. *See also* S.Rep. No. 103–169 at 21.

contrary to the scope of the Attorney General's rulemaking authority. But where there is market failure, negotiability is a blunt instrument. This truth is at the core of both regulatory and legislative action to regulate the mortgage broker and lending industry. As the consumer injury caused by reverse redlining and predatory lending is substantial, is not outweighed by countervailing benefits, and is not reasonably avoidable by the borrower, a determination that such conduct is unfair is consistent with the rules, regulations, and interpretations of the Federal Trade Commission. Moreover, the public policy interest behind such regulation further establishes its propriety. The objective of the Regulation, like the objective of the Home Ownership and Equity Protection Act, is to make fair credit available in all communities. The elimination of redlining and reverse redlining is essential to the proper functioning of the home equity finance market and the achievement of this objective.

This Court concludes that the Regulation is not inconsistent with the pronouncement of the Federal Trade Commission or federal courts' construing of 15 U.S.C. § 45(a)(1).

## C. VAGUENESS

■ United argues that the failure to define "otherwise unconscionable" makes the regulation vague as a mortgage lender cannot determine in advance what conduct will or will not be deemed unconscionable. United avers that the Regulation is unconstitutionally vague on its face and, therefore, is void and unenforceable. This Court disagrees. The standard for determining whether a business regulation is unconstitutionally vague is not the same as the stan-

dard for determining whether a law which affects First Amendment rights or criminal conduct is unconstitutionally vague. *See Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Caswell v. Licensing Comm'n for Brockton*, 387 Mass. 864, 873, 444 N.E.2d 922 (1983). A business regulation "is not facially overbroad or vague if it does not reach constitutionally protected conduct and is reasonably clear in its application to the complainant." *Flipside*, 455 U.S. at 505, 102 S.Ct. 1186. To establish that the Regulation is unconstitutionally vague, United "must demonstrate that the law is impermissibly vague in all of its applications." *Whiting v. Town of Westerly*, 942 F.2d 18, 22 (1st Cir.1991). United has not met this burden.

■ United wrongly attempts to characterize the Regulation as penal in nature and, therefore, subject to the stricter vagueness standard. In support of this position, United relies on *American Dog Owners Assoc., Inc. v. City of Lynn*, 404 Mass. 73, 533 N.E.2d 642 (1989). Unlike the animal control ordinance dealt with in *American Dog Owners Assoc.*, the Regulation does not impose a fine, involve the forfeiture of property, or seek to protect the public as a whole from injury. The Regulation is part of the state's consumer protection law and deals with the regulation of business activities, specifically mortgage lending. Violation of the Regulation is a violation of Mass. Gen. Laws ch. 93A. Chapter 93A is a business statute under which individual litigants may obtain actual damages and equitable relief, the Attorney General may obtain injunctive relief, and a civil penalty may be imposed.[6] The imposi-

---

6. In civil actions pursuant to Mass. Gen. Laws ch. 93A, § 9, if the plaintiff prevails, she is entitled to recover actual damages or, where the violation is knowing or willful, she is entitled to recover at least double damages and up to treble damages. *See* Mass. Gen. Laws ch. 93A, § 9(3). If a reasonable offer of settlement was made within thirty days of receiving the prevailing party's chapter 93A demand letter, then recovery is limited to the settlement offer. *See id.* Equitable relief is also available. *See id.* Along with recovering actual damages, the prevailing party is entitled to reasonable attorney's fees and costs. *See* Mass. Gen. Laws. ch. 93A, § 9(4). In actions initiated by the Attorney General pursuant

to Mass. Gen. Laws ch. 93A, § 2, the court may issue a temporary restraining order or preliminary or permanent injunction to restrain a person from using an unfair or deceptive act or practice. Moreover, the Court may award compensatory damages to any person for the loss of any money or real or personal property due the unlawful act or practice. *See id.* A civil penalty of not more than five thousand dollars may be levied if the Court finds that "a person has employed any method, act, or practice which he knew or should have known to be in violation of [chapter 93A, § 2]," *id.,* along with the reasonable costs of investigation and litigation of the violation.

tion of a civil penalty alone does not transform the statute into a criminal statute.

■ Moreover, "in reviewing a business regulation for facial vagueness, the principal inquiry is whether the law affords fair warning of what is proscribed." *Flipside,* 455 U.S. at 503, 102 S.Ct. 1186. In the Regulation, a mortgage lender may not "negotiate or procure" for a borrower mortgage rates or other terms which "significantly deviate from industry-wide standards or which are otherwise unconscionable." 940 C.M.R. 8.06(6). The Regulation, a business regulation, does provide United with a fair warning that the charging of origination fees that are twice as large as those charged by other subprime lenders in Massachusetts is likely violative of the Regulation. *See* Dupont Aff., Ex. 48; Benig Aff., Ex. 49.

■ "Rules governing commercial conduct need not be drawn with undue precision." *Town of Brookline v. Commissioner of the Dep't of Environmental Quality Engineering,* 387 Mass. 372, 377, 439 N.E.2d 792 (1982); *accord Commonwealth v. Gustafsson,* 370 Mass. 181, 187, 346 N.E.2d 706 (1976) (upholding the constitutionality of a state statute against a vagueness challenge where the statute proscribed "unreasonable", "unfair", "unconscionable" or "deceptive" conduct). In speaking of unfair or deceptive practices, Congress and the Federal Trade Commission have taken the position that a specific definition of such practices is not appropriate as it would necessarily be underinclusive, creating a shield for subsequent unfair or deceptive practices as the markets for goods and services evolve. *See Sperry & Hutchinson Co.,* 405 U.S. at 239, 92 S.Ct. 898; *Federal Trade Comm'n v. R.F. Keppel & Bro., Inc.,* 291 U.S. 304, 310, 54 S.Ct. 423, 78 L.Ed. 814 (1934) ("Neither the language nor the history of the Act suggests that Congress intended to confine the forbidden methods to fixed and unyielding categories."); *Gustafsson,* 370 Mass. at 187, 346 N.E.2d 706 (quoting *Sears, Roebuck & Co. v. Federal Trade Comm'n,* 258 F. 307, 311 (7th Cir.1919); *see also Commonwealth v. DeCotis,* 366 Mass. 234, 242, 316 N.E.2d 748 (1974)); Policy Stmt. at 35. The Regulation gives United two reference points by which

to gauge its conduct: 1) the industry-wide standard, and 2) the Massachusetts doctrine of unconscionability. Thus, United's argument that the statute is void due to vagueness fails.

## D. ARBITRARY AND CAPRICIOUS APPLICATION OF THE REGULATION

■ United argues that the Attorney General inappropriately applies the Regulation by focusing on the points charged and not the cost of the entire transaction to the consumer. United asserts that the number of points charged was necessary in order for the annual percentage rate to be 13.556%. The language of the Regulation addresses "rates or other terms" but it does not state that a particular rate or term is an insufficient basis for a finding of unfair or deceptive practice. In fact, in the Special Report issued by the Attorney General after the enactment of the Regulation, the objective of the Regulation is described as "[p]rohibiting unconscionable rates or other loan terms." *Special Report* at 311. Any rate or term in a mortgage loan that substantially deviates from industry-wide standard or is otherwise unconscionable violates the Regulation.

## E. DEFAULT ON THE PROMISSORY NOTE

United seeks damages for Sargeant's breach of contract. Sargeant counterclaims that she may rescind the mortgage because United's conduct in the mortgage transaction was unconscionable. In support of this claim of unconscionability, Sargeant argues that 1) the origination fee was above the industry standard of 3 to 5 points; 2) the fees paid by Sargeant were grossly disproportionate to the value received; 3) the loan violated United's debt-to-income parameters for a "C" borrower like Sargeant; 4) United's method of determining compensation for its loan originators encourages the originator to act in an unconscionable manner; and 5) United's disclosures in the mortgage transaction did not comply with United policy and state disclosure requirements.

### 1. Unconscionability

Unconscionability is a question of law to be assessed at the time the contract was executed by the parties. *See Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 291, 408 N.E.2d 1370 (1980). It is a case-specific assessment. "Because there is no clear, all-purpose definition of 'unconscionable,' nor could there be, unconscionability must be determined on a case by case basis, giving particular attention to whether, at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party." *Id.* 381 Mass. at 292–93, 408 N.E.2d 1370 (internal citations omitted). Where the word "unconscionable" is used in a statute or a regulation, "[a] court may be guided by the text of a statute and a consideration of the abuses sought to be remedied by its enactment," *Gustafsson*, 370 Mass. at 187, 346 N.E.2d 706, in determining its meaning.

The principle of unconscionability is addressed in the Uniform Commercial Code, *see* U.C.C. § 2–302, and the Supreme Judicial Court has applied the principles of unconscionability articulated there to "situations outside the ambit of the code." *Waters v. Min Ltd.*, 412 Mass. 64, 67, 587 N.E.2d 231 (1992). Under Massachusetts law, the doctrine of unconscionability recognizes procedural and substantive unconscionability. *See Zapatha*, 381 Mass. at 292–93, 294 n. 13, 408 N.E.2d 1370. Procedural unconscionability evaluates the circumstances under which the contract was executed to determine if it is the product of unfair surprise. Substantive unconscionability evaluates the actual terms of the contract to determine if they are substantively unfair. "If the sum total of the provisions of a contract drive too hard a bargain, a court of conscience will not assist its enforcement." *Waters*, 412 Mass. at 68, 587 N.E.2d 231 (citing *Campbell Soup Co. v.*

*Wentz*, 172 F.2d 80, 84 [3d Cir.1948] ). Sargeant alleges both procedural and substantive unconscionability on the part of United in the loan transaction.

As previously discussed, the Regulation here was promulgated in order to counter the reverse redlining practices pervasive in low-income communities and communities of color during the eighties and early nineties. *See Special Report* at 308–09. These lending practices had dire financial consequences for borrowers often resulting in foreclosure. *See id.* Here, Sargeant avers that the points charged are unconscionable because they substantially deviate from the industry-wide standard. To establish the industry-wide standard for subprime loans, Sargeant offers the Affidavit of Eric C. Dupont, Deputy Commissioner for Consumer Compliance for the Division of Banks of the Commonwealth of Massachusetts, and an Affidavit from Stephanie Benig, volunteer extern at the Office of the Attorney General of the Commonwealth of Massachusetts. *See* Ex. 48 & 49. Both of these affidavits have been submitted by the Attorney General in its suit against United in Massachusetts Superior Court. Sargeant argues that these affidavits establish that the industry-wide standard for the number of points to charge in a subprime loan transaction is two or three points with five points representing the outer limit. The Benig Affidavit shows the subprime mortgage lenders offering an interest rate similar to United charged no more than five points. United offers no contrary evidence. As this is a case stated, this Court may draw all reasonable inferences. This Court concludes that Sargeant has established by a fair preponderance of the evidence that the charging of ten points on a subprime mortgage with an interest rate of 10.99 percent substantially deviates from industry-wide practice.[7] United's conduct thus violates Mass. Gen. Laws ch. 93A, § 2(a).

---

**7.** The results of the Consumer Complaint Unit's review of the points charged lenders offering subprime mortgage loans in Massachusetts does not establish that two or three points is the standard amount charged because the data given establish only the number of points charged for all mortgage loans closed, including A paper mortgage loans. The data provide aggregate information; they do not disaggregate the A paper mortgage loans from the B and C paper mortgage loans or provide a breakdown of the number of loans in each category. The Benig Affidavit, however, provides more focused data dealing with the points charged for B paper and C paper mortgage loans.

The fact that this conduct constitutes an unfair or deceptive practice, however, does not mean that this conduct was unconscionable.

### a. Substantive Unconscionability
### 1) Disparity Between Fees and Value

 Sargeant avers that the terms of the loan are substantively unconscionable given the gross disparity in the value she received in comparison to the consideration given by her. "Gross disparity in the values exchanged is an important factor to be considered in determining whether a contract is unconscionable." *Waters*, 412 Mass. at 69, 587 N.E.2d 231.

Sargeant's loan initially closed on August 28, 1995, but was canceled because United was unable to record its mortgage in first priority position due to the existence of a mortgage to Foremost Services Company. Sargeant was not making any payments on this obligation nor had Foremost commenced any foreclosure proceedings. Upon learning of this title problem, United avers that it enlisted the services of McIntyre who negotiated an agreement with Foremost to settle this obligation for a payment of $5000. The loan was restructured, in light of this other mortgage, with different terms on the consolidation of Sargeant's credit card debt. Under the initial proposal, $9826 was to be applied to pay off six out of her eight cards. Under the second loan, none of her credit card debt was paid off and only $4910 was applied to pay down three credit cards. In its request for loan approval dated September 22, 1995, the originator wrote "Customer will benefit by paying off all debt and saving $350 per month and completing desired home improvements. United will benefit by acquiring st [sic] position on a well maintained property." Stipulated Ex. 47. This statement mischaracterizes the value or benefit obtained for Sargeant in the transaction. Prior to obtaining the loan, Sargeant owned a three-family home with an appraised value of $159,000 encumbered by mortgages totaling $93,000.[8] She had unsecured consumer debt of $14,963. *See* Stipulated Ex. 11. After entering into the mortgage loan with United, her home was subject to a $134,700 mortgage. The equity value in her home had declined from $56,000 to $24,300 and $4,910 of previously unsecured consumer debt was now secured debt. The amount of the loan allocated for home improvements, which was the reason for Sargeant's application for loan from United, was only $15,681.92. *See* Stipulated Ex. 33.

United argues that Sargeant obtained substantial value in the transaction because she received a discharge of the lien on her house held by Foremost Services Company, her desired home improvements, and a lower monthly debt payment. United's explanation glosses over the resulting financial ramifications of this loan transaction, namely the increase in secured debt beyond the amount of the home improvement loan. Moreover, the decrease in overall monthly total debt offered by United was not fixed. As the mortgage had a variable interest rate, the amount of Sargeant's monthly debt payment would not remain constant. Prior to the loan, her monthly credit card payments were $569 and her monthly mortgage payment was $956.00. *See* Stipulated Ex. 11. Her total monthly debt payment was $1525. Following the execution of the loan, her monthly credit card payments were $236 and her initial monthly mortgage payment was $1281. Def.'s Reply at 14; Def.'s Mem. at 17; Stipulated Ex. 21. Her total monthly payment initially was $1517, but would eventually rise to $1620.[9] Do these terms "drive too hard a bargain"?

### 2) Violation of Debt-to-Income Parameters.

 To further support her position of substantive unconscionability, Sargeant as-

---

**8.** Her total mortgage indebtedness was the sum of her $88,000 first mortgage with AFSCI plus her $5000 second mortgage with Foremost Servicing Company, Inc.

**9.** The payment schedule according to the Truth in Lending Disclosure Statement signed by Sargeant at the September closing indicates that for the first six months her monthly payment would be $1281.76, then $1383.91 for the next six months, and then $1384.93 for the remaining term of the loan. Rising interest rates could drive the payment still higher.

serts that United violated its own debt-to-income parameters in issuing a loan to her. She argues that under United's debt-to-income parameter, no loan should issue to a "C" credit borrower whose ratio is greater than 47 percent. Since her ratio was 51 percent, the approval of the loan was against company policy and, she says, proof of the unfairness and unconscionability of the loan transaction. *See* Request for Loan Approval, Transcript of Richard Deposition, Ex. 19, Stipulated Ex. 47. A review of United's underwriting parameters reveals that 47 percent was the suggested, not the required, debt-to-income ratio for a "C" credit borrower. *See* United Companies Lending Corporation: Fixed and ARM Loan Programs and Underwriting Parameters 24 (June 1, 1995), Transcript of Richard Deposition, Ex. 20, Stipulated Ex. 47. An underwriter had the discretion to approve a loan with a higher debt-to-income ratio. The exercise of such discretion is not unconscionable.

### b. Procedural Unconscionability
### 1) Compensation Method of Originators

■ Sargeant asserts that the compensation method for United's loan originators encourages unconscionable behavior, namely charging a high number of points. The commission payable to Richard, Sargeant's loan originator, is determined by a formula based on the gross amount of origination fees he generates and the number of loans he closes. Richard recommends the number of points to be charged to a mortgage loan. "The recommendation is almost invariably accepted by United." Joint Stmt. Undisputed Facts ¶ 30. He always recommends 10 points unless a borrower objects and negotiates for a lower fee. *See id.* Customers object only 15% of the time. *See id.* In 1995, Richard earned $90,000, of which $75,000 was commission. *See id.* This compensation policy does not establish that the mortgage transaction was unconscionable, but rather goes to the question of whether United had knowledge that Richard's conduct was in violation of Mass. Gen. Laws ch. 93A and, therefore, entitles Sargeant to double damages and possibly treble damages pursuant to Mass. Gen. Laws ch. 93A, § 9. A willful or knowing employment of an unfair or deceptive trade practice

entitles a plaintiff to double or treble damages. *See* Mass. Gen. Laws ch. 93A, § 9(3). Here, United was aware of the points recommended by Richard, as it had to approve such recommendations. This number of points substantially deviated from industrywide standards in Massachusetts. Nonetheless, the record does not indicate whether United had any data regarding the points charged by other subprime lenders in Massachusetts. Although this lack of knowledge does not preclude a determination that such conduct constituted an unfair or deceptive trade practice, it does preclude the awarding of double or treble damages to Sargeant.

### 2) Failure to Follow Disclosure Requirements

■ In this proceeding, Sargeant avers that United failed to provide her with the proper disclosure of the origination fee pursuant to Mass. Gen. Laws ch. 183, § 63. Sargeant argues that the disclosure provided was insufficient because United failed to label properly the origination fee, thereby hiding from Sargeant the number of points charged. Section 63 permits an mortgage lender or mortgage broker to charge a loan fee, finder's fee, points, or similar fees provided that such fee is previously disclosed to the mortgagor in writing. This disclosure requirement can be satisfied by fulfilling the disclosure requirements set forth in Mass. Gen. Laws ch. 184, § 17D, or "such other form which discloses said fees or points." Mass. Gen. Laws ch. 183, § 63. According to the evidentiary record, United provided Sargeant with a Good Faith Estimate of Settlement Costs which listed the origination fee as ten percent with an estimated cost of $13,750.00. *See* Stipulated Ex. 3. Sargeant signed this document on August 9, 1995, the date on which the initial loan application was completed. Moreover, on the same date Sargeant signed a Receipt of Disclosure Information form indicating her receipt of the disclosure information required by Mass. Gen. Laws ch. 184, § 17D. Thus the prior disclosure required by Massachusetts laws in order to charge points has been satisfied. *See* Mass. Gen. Laws ch. 183, § 63.

Sargeant correctly points out that the settlement cost sheet, provided at the September closing, does not list an origination fee. Instead, there is a broker fee of $4150 to United Capital Systems, and a brokerage fee of $13461.40 to United Company Lending. *See* Stipulated Ex. 16. Under Massachusetts law, a brokerage fee is not an origination fee. A brokerage fee is any fee imposed by a mortgage broker for the broker's service in obtaining a mortgage loan. *See* 940 C.M.R. § 8.03. In this transaction, McIntyre was the mortgage broker and United was the mortgage lender. As such, McIntyre was entitled to a brokerage fee and United was entitled to an origination fee which is a fee charged by a mortgage lender as additional compensation for the mortgage loan. *See Id.* United was not entitled to a brokerage fee. Massachusetts law prohibits a mortgage lender from receiving both a brokerage fee and a origination fee. *See* 940 C.M.R. § 8.06(8). Because of this mislabeling, Sargeant argues that this Court should find such conduct unconscionable and rescind the loan. This Court, however, finds that the requisite disclosure was made notwithstanding the error in the final settlement sheet.

 It is not necessary for this Court to determine whether the listed fee is a brokerage fee or an origination fee, because the conclusion is the same. If it is a brokerage fee, United is not entitled to it because it did not provide the requisite disclosure and cannot act as both the mortgage lender and mortgage broker in the same loan transaction. *See* 940 C.M.R. §§ 8.05 & 8.06(8). If it is an origination fee, United is not entitled to it because it substantially deviates from industry-wide practice. Either analysis leads to the same conclusion—that such conduct constitutes an unfair or deceptive trade practice in violation of Chapter 93A. *See* 940 C.M.R. §§ 8.05 & 8.06(6). As a result, Sargeant is entitled to actual damages. *See* Mass. Gen. Laws ch. 93A, § 9(3). However, this error is not unconscionable.

 The Court must address one last issue. Because the required Mortgage Broker Disclosure form was not completed,

McIntyre was not entitled to a brokerage fee. Except for Sargeant's signature, the required disclosure form is blank. Stipulated Ex. 10. This is insufficient to satisfy the statutory disclosure requirements of Mass. Gen. Laws ch. 183, § 63. The lack of a signed authorization in the file for the payment of a brokerage commission to McIntyre as required by United policy and, more importantly, Massachusetts law entitles Sargeant to reimbursement of this fee. Pursuant to 940 C.M.R. § 8.05, the failure to make such a disclosure is an unfair or deceptive practice. As a result, Sargeant is entitled to actual damages.

### CONCLUSION

1. For the reasons stated herein, this Court declares that the Regulation is valid and enforceable.

2. The origination fee charged by United constituted an unfair and deceptive trade practice as the points charged substantially deviated from industry-wide practice in Massachusetts. Therefore, Sargeant is entitled to actual damages of $13,461.40 plus interest. McIntyre was not entitled to a brokerage fee as he failed to provide Sargeant with the requisite disclosure. Such failure to disclose constitutes an unfair and deceptive trade practice in violation of Mass. Gen. Laws ch. 93A, § 2(a) and a violation of the disclosure requirements of Mass. Gen. Laws ch. 183, § 63. Therefore, Sargeant is entitled to actual damages of $4,150.00 plus interest. Sargeant is also entitled to reasonable attorney's fees in prosecuting to her Chapter 93A claims. *See* Mass. Gen. Laws ch. 93A, § 9(4).

3. Upon reflection, as the question of unconscionability is a close one, the matter is a fact-specific expression of Massachusetts common law, and an equally just ground of decision between these particular parties is available, this Court refrains from expressing an opinion on the issue of unconscionability. While the question could readily be decided by a Justice of the Massachusetts Superior Court,[10] I am hesitant as a federal judge to

10. Many commentators consider the Massachusetts Superior Court to be the greatest common

law court in America today. Its justices are frequently called upon to decide when the mores

declare Massachusetts common law in the absence of some decisional guidance. Nor is the question of sufficient significance to warrant certification pursuant to Massachusetts Supreme Judicial Court Rule 3:03.

A court sitting in equity, however, is necessarily empowered to do complete justice as between the parties. *See Porter v. Warner Holding Co.,* 328 U.S. 395, 402–03, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution,* 712 F.Supp. 994, 1001–02 (D.Mass. 1989). Here, Daisy Sargeant initiated neither the state nor the federal action. She only filed a consumer complaint with the Massachusetts Attorney General who, appreciating the seriousness of the matter, filed suit on behalf of all the citizens of the Commonwealth in the Massachusetts Superior Court. It was United who went forum shopping, and named Sargeant as the representative of the defendant class in the federal court. The Attorney General chose not to litigate here and Sargeant was thus left to fend for herself, ultimately vindicating the Attorney General's regulation generally as well as successfully rebuking the application of United's attempted unfair and deceptive acts to her. While she is entitled to her attorney's fees in prosecuting her counterclaim under Chapter 93A, this cannot adequately compensate her for alone bearing the full burden of this complex litigation. The Court also notes that her success will inure to the benefit of all others similarly situated through the offensive use of collateral estoppel against United. *See Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); Rest. (2d) Judgments § 29. Finally, it is well within a court's equitable powers to reward a named class representative in successful class action litigation. *See, e.g., VanVranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 299 (N.D.Cal. 1995); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F.Supp. 680, 689 (D.Minn.1975). The Court

therefore awards Sargeant an opportunity similar to, albeit not as complete as, rescission. Should Sargeant, within six months of the date of this order, tender to United the outstanding principal (not interest) due on the loan as of the date of this order as well as interest thereon at the contract rate from this date, the mortgage shall be discharged and the mortgage note satisfied.

4. While United commenced this action against a putative class of persons similarly situated to Sargeant, the Court declines to certify the action for class treatment. The Court reaches this result because, as to any matters which remain for decision, individual factual questions predominate over those common to the class. *See* Fed.R.Civ.P. 23(b)(3).

The parties shall prepare a form of judgment.

---

of the Commonwealth warrant access to its courts. *See, e.g. Prince–Jackson v. Children's Hosp. Med. Ctr.,* No. 72769 (Mass. Superior Ct. Apr. 8, 1985), declaring for the first time that a

parent could recover for the loss of consortium arising out of injuries to a minor child, a position later adopted by the Massachusetts legislature, *see* Mass. Gen. Laws ch. 231 § 85X.