2009 OK CIV APP 13

DEUTSCHE BANK NATIONAL TRUST COMPANY, As Trustee of Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2006–R1 Under The Pooling and Servicing Agreement Dated as of February 1, 2006, Plaintiff,

v.

David DANIEL and Diana D. Nelson, husband and wife, Defendants/Third–Party Plaintiffs/Appellants,

and

Occupants of the Premises, and Lance James Nelson and Jane, his spouse, if married, Defendants,

v.

Ameriquest Mortgage Company, Inc., Third–Party Defendant/Appellee,

and

Nations Title Company, Third–Party Defendant.

No. 105,481.

Court of Civil Appeals of Oklahoma, Division No. 4.

Aug. 12, 2008.

Rehearing Denied Sept. 19, 2008.

Certiorari Denied Jan. 12, 2009.

David Daniel, Madill, OK, Appellant pro se.

Jon Epstein, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Oklahoma City, OK, for Appellee.

DOUG GABBARD II, Presiding Judge.

¶ 1 In this tort and contract action growing out of a foreclosure, Defendant/Third–Party Plaintiff/Appellant David Daniel (Borrower) [1] appeals a summary judgment granted in favor of Third–Party Defendant/Appellee Ameriquest Mortgage Company (Ameriquest). After review of the facts and the law, we affirm.

### FACTS

¶ 2 On November 11, 2005, Borrower and Defendant/Third Party Plaintiff Diana D. Nelson (collectively, Borrowers) refinanced their Moore, Oklahoma, home with Ameriquest. They executed a $71,920 promissory note and a mortgage to Ameriquest in exchange for payment of their existing $42,408.65 mortgage balance owed to OCWAN Federal Savings, payment of nine separate credit card accounts, and $9,873.48 in cash.

---

1. Although Borrower has attempted to file his amended petition in error on behalf of both himself and Diana Nelson, Nelson failed to sign the pleading and Borrower is not authorized to do so on her behalf. Therefore, this appeal shall proceed as to Borrower David Daniel only.

¶ 3 The adjustable rate note provided for an initial interest rate of 8.75% for the first three years, and then a variable rate. Directly above their signatures on the note, Borrowers acknowledged that oral agreements, promises, or commitments to lend money are not enforceable and "[t]his written agreement contains all the terms the Borrower(s) and the Lender have agreed to." Another document, "Understanding Your Loan," advised Borrowers that they could have an attorney at the closing, further advised them, "Don't let anyone pressure you into obtaining a loan," recommended that they consult other lenders to confirm that the terms of the loan were acceptable, notified them they had seven days from the date of closing to cancel the loan for any reason, and further advised them that "[N]o money will be disbursed before 10:00 a.m. on the first business day after this period expires." Although Borrower asserts that he did not sign this document, it purportedly contains both Borrowers' signatures.

¶ 4 Borrowers failed or refused to pay on the note and mortgage after January 1, 2006. The note and mortgage were assigned to Plaintiff Deutsche Bank in February 2006. Pursuant to the terms of the mortgage, Deutsche Bank initiated a foreclosure action in June 2006. Borrowers answered and filed counterclaims against Deutsche Bank, asserting violation of the Federal Home Ownership and Equity Protection Act (HOEPA), fraud (by misrepresenting the costs, fees, and interest rate of the note and mortgage), emotional distress, breach of an oral contract regarding the interest rate of the note and mortgage, and negligence.

¶ 5 Deutsche Bank filed a motion for summary judgment, which the trial court granted. The trial court found Borrowers had executed the note and mortgage, failed to make the required payments, and were in default. The court also found:

> It is undisputed that Daniel and Nelson knew the actual interest rate and payment amount prior to closing and chose to borrow the money on those terms. It is also undisputed that they were given another week to rescind the loan for any reason and did not do so. In any event, any alleged oral representation was superseded by the subsequent written agreements. 15 Okla. Stat. § 137. Any claim based on pre-closing oral comments purportedly made by Ameriquest are not actionable.

¶ 6 In appeal number 104,721, we summarily affirmed the trial court's judgment. Mandate was issued in December 2007.

¶ 7 The present appeal involves Borrowers' third-party petition against Ameriquest. In that petition, Borrowers asserted six causes of action against Ameriquest which are almost identical to their earlier claims against Deutsche Bank. Ameriquest filed a motion for summary judgment, which the trial court granted "as prayed in its [Ameriquest's] motion and brief." Borrower now appeals.[2]

## STANDARD OF REVIEW

¶ 8 Summary judgment may be granted when there is no substantial controversy as to any material fact. Rule 13(a), Rules for District Courts, 12 O.S. Supp.2007, Ch. 2, App. The granting of summary judgment upon undisputed material facts presents an issue of law and, therefore, requires a *de novo review. Neil Acquisition, L.L.C. v. Wingrod Inv. Corp.*, 1996 OK 125, ¶ 5, 932 P.2d 1100, 1103. "An appellate court claims for itself plenary, independent and non-deferential authority to re-examine a trial court's legal rulings." *Id.* at n. 1; *see also Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

## ANALYSIS

¶ 9 Because Borrower's claims arise out of a real estate transaction involving a commercial lender and a closing agent,[3] it may be

---

**2.** The record contains a notice of completion of the record from the Cleveland County Court Clerk's office and a subsequent withdrawal of completion. However, it appears all the relevant documents have been included in the record submitted to this Court.

**3.** The closing agent in this case was Nations Title, which Borrowers sued, but never obtained service upon. For this reason, Nations Title is not a party to this appeal.

helpful to review the basic elements of such a transaction.

¶ 10 Lending transactions involving nationwide commercial lenders such as Ameriquest often begin with a bulk mail, phone solicitation, or television commercial addressed to persons identified as prospective borrowers. The transaction is initiated when a prospective borrower contacts the lender and completes a loan application, in writing and/or by phone. After reviewing the application and completing a credit check, the lender may extend a loan offer with an *estimated* interest rate. Sometimes the offer will "lock in" the interest rate for a period reasonably necessary to close the loan. If the prospective borrower accepts the tentative loan offer, the lender will obtain information from the borrower regarding the property and, in case of a refinance, the existing mortgage. Usually, the lender then contacts a closing agent who lives near the borrower, and requests title work, an appraisal, inspections, and so forth.

¶ 11 The closing agent is usually an independent company which facilitates the loan transaction for both the lender and the borrower. The closing agent will prepare or order the title work, appraisal, and inspections, determine whether taxes have been paid, calculate estimated taxes, notify the lender of its own fees and costs, verify that the loan documents are consistent with the parties' agreement, and obtain the borrower's signature on the loan documents. Often, the closing agent will accept the loan funds from the lender, place them into an escrow account, and disburse them in accordance with the terms of the loan.

¶ 12 As quickly as it can, the closing agent provides the lender with property tax information and with other estimated costs and fees for the work ordered. The lender then prepares a good faith estimate of costs for the buyer, which includes all of these items, together with its own estimated costs and fees.[4] After the title work, title requirements, inspection, appraisals, etc., are com-

pleted, and all final costs are known, the lender prepares the note, mortgage, and other closing documents, and sends these to the closing agent. The closing agent then obtains the borrower's signature on the loan documents. After the lender has verified the proper execution of the loan documents, it will either wire transfer the loan funds directly to the seller or the prior mortgage holder, or wire the funds into the closing agent's escrow account. If the latter occurs, the closing agent must disburse the funds in accordance with the loan agreement.

¶ 13 In the instant case, the loan was completed in a manner very similar to that described above. Indisputably, Borrower signed the note and mortgage, Ameriquest disbursed the loan funds, Borrower failed to make payments thereon, and, in accordance with the terms of the mortgage, the mortgage holder, Deutsche Bank, eventually filed a foreclosure. In the previous appeal, we affirmed the trial court's summary judgment of foreclosure in favor of Deutsche Bank. We now address the trial court's summary judgment in favor of Ameriquest on Borrower's third-party petition.

■ ¶ 14 In his first cause of action, Borrower asserts that Ameriquest engaged in predatory lending practices that had high up-front costs and a high interest rate. Borrower alleges that the loan was designed to fail and was in violation of HOEPA. He relies upon *Bankers Trust Co. v. Brown,* 2005 OK CIV APP 1, 107 P.3d 609.

¶ 15 In *Bankers Trust,* another division of this Court reviewed a foreclosure action where the trial court dismissed the borrower's claims of "reverse redlining"[5] and predatory lending under HOEPA. At issue was 15 U.S.C. § 1639(h) (OCIS 2008):

A creditor shall not engage in a pattern or practice of extending credit to consumers under mortgages referred to in section 1602(aa) of this title based on the consum-

---

4. This usually includes the loan origination fee, discount points, a processing fee, and other costs and fees which the lender intends to charge.

5. "Reverse redlining" has been defined as the practice of denying the extension of credit to

specific geographic areas due to income, race, or ethnicity of its residents. *United Cos. Lending Corp. v. Sargeant,* 20 F.Supp.2d 192, n. 5 (D.Mass.1998).

ers' collateral without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations, and employment.

The Court of Civil Appeals noted the borrower "asserted that her property was in a blighted area, that the interest rate [12.875%] and closing fees she was charged were exorbitant, that she had no ability to repay the loan, and that Lenders issued a loan 'designed to fail,' with the intent to recover the value of the loan through foreclosure rather than repayment." *Id.* at ¶ 10, 107 P.3d at 612 (footnote omitted). In reversing, the Court found the allegations sufficient to set forth a cause of action.

¶ 16 Here, although Borrower does not claim that his property was located in an ethnic or blighted area, he makes the other claims set forth in *Bankers Trust*. However, these claims are not substantiated by the evidentiary material. In fact, that material establishes that the 8.75% interest rate was not exorbitant, the closing fees were not excessive,[6] and Borrower admittedly had the ability to repay the loan when he executed it.[7] In addition, Ameriquest made numerous phone calls to Borrower seeking payment in order to avoid foreclosure, and never attempted to recover the value of the loan through foreclosure, but assigned the loan to Deutsche Bank.

■ ¶ 17 In his second cause of action, Borrower asserts that Ameriquest intentionally caused him severe emotional distress by demanding money which Borrower did not owe. In order to prove this claim, a plaintiff must demonstrate extreme and outrageous conduct done intentionally or recklessly by a defendant which results in severe emotional distress. *Kraszewski v. Baptist Med. Ctr. of Okla., Inc.,* 1996 OK 141, ¶ 13, 916 P.2d 241, 248, citing *Breeden v. League Servs. Corp.,*

1978 OK 27, 575 P.2d 1374. Here, the evidentiary material indicates that Ameriquest did not act intentionally or recklessly, but that all amounts requested by Ameriquest were either set forth in the loan documents, were based upon demands by OCWAN for additional funds to pay off Borrower's prior mortgage,[8] or occurred as a result of an increase in Borrower's property taxes due to a reassessment by the County Assessor.

■ ¶ 18 In his third cause of action, Borrower asserts that Ameriquest fraudulently misrepresented the costs, fees, and interest rate on the note and mortgage, thereby inducing him to complete the loan transaction. Borrower relies upon 15 O.S.2001 § 233 and *Dewberry v. Yellow Manufacturing Acceptance Corp.,* 1964 OK 193, 396 P.2d 522. Section 233 allows a party to rescind a contract where acceptance was obtained through fraud, and *Dewberry* applies the general rule that where the terms of an agreement are reduced to writing, the parties are bound by that written agreement "in the absence of fraud or mistake." *Id.* at ¶¶ 12–13, 396 P.2d at 524.

¶ 19 Although Ameriquest gave Borrower an estimate of costs, fees, and an interest rate which was lower than that contained in the final loan documents, Borrower's claim fails for a simple reason. When Borrower signed the written contract, he indisputably understood that the loan provided for 8.75% interest for three years, followed by a variable rate. These may not have been the terms Borrower hoped for or expected, but he agreed to them.

■ ¶ 20 In his fourth cause of action, Borrower alleges that Ameriquest promised him a low interest rate, encouraged him to obtain high interest interim loans which he

---

6. The actual settlement charges were not proportionally greater than those which Borrower originally agreed to. The estimated settlement charges were $5,469.41, or 9.7% of $56,363.59, the original loan amount requested. The actual settlement charges were $7,599.95 or 10.6% of the $71,920 loaned. It is not unusual for settlement costs and expenses to increase with the size of the loan, since discount points, processing fees, closer costs, and other fees are often based upon a percentage or the size of the total loan.

7. Although Borrower lost his job due to an arrest for a drug violation, and was later sent to prison, this occurred several weeks after the execution of the loan documents.

8. We more fully address this issue in a latter portion of this opinion.

could not repay, and then used "economic duress" to force him into accepting a higher interest rate than he anticipated. Borrower relies upon *Clinesmith v. Harrell*, 1999 OK CIV APP 121, 992 P.2d 926, in which the plaintiff signed a release covering all claims against the defendants for the death of his son, but asserted that he did so due to economic duress, in that he owed money for his son's funeral. Another division of this Court affirmed a summary judgment for the defendants, and applied the rule that this type of duress requires threats or coercive conduct by the party seeking to enforce the agreement which exacerbates economic pressure. *Id.* at ¶ 10, 992 P.2d at 928.

¶ 21 Viewing the present evidentiary material most favorably to Borrower, we find no evidence of threats or coercive conduct on the part of Ameriquest. In fact, Ameriquest has submitted evidence that three weeks after the loan, Borrower expressed his satisfaction with the transaction and the treatment he received. Although Borrower alleges otherwise, mere allegations in a pleading which are unsupported by evidentiary material will not defeat a motion for summary judgment that is otherwise good. *Weldon v. Dunn*, 1998 OK 80, ¶ 8, 962 P.2d 1273, 1275–76.

¶ 22 In his fifth cause of action, Borrower alleges that Ameriquest breached a prior verbal contract for an annual percentage rate of 8% and a monthly payment of $560, including insurance and taxes.[9]

¶ 23 In its earlier grant of summary judgment to Deutsche Bank, the trial court, relying upon 15 O.S.2001 § 137, held that Borrowers were bound by the written contract, and that the *"oral representation* was superceded by the subsequent written agreements." (Emphasis added). Clearly the trial court found that there was only a representation, not a contract. This finding is a final judgment, and Borrower is collaterally estopped from asserting otherwise. *See Benham v. Plotner*, 1990 OK 64, 795 P.2d 510.

¶ 24 Even if this were not so, we would reach the same result. The closing documents clearly indicate that the lower interest rate and monthly payment were *contingent* or *estimated* terms or offers, subject to the lender's final approval. Furthermore, when Borrower signed the note containing the higher interest rate and monthly payment, he acknowledged that the note "contains all the terms the Borrower(s) and the Lender have agreed to." In that regard, 15 O.S.2001 § 137 provides:

> The execution of a contract in writing, whether the law requires it to be written or not, supersedes all oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument.

Clearly, the written contract superseded all prior oral negotiations and offers by the lender to Borrower. Furthermore, even if the parties had previously entered into an oral contract for an 8% interest rate and $560 monthly payment, the oral contract was thereafter modified when Borrower signed the written loan documents.

¶ 25 In his sixth cause of action, Borrower asserts that Ameriquest breached the contract and was negligent in calculating the payoff amount to Borrower's original mortgage company and in timely transferring funds to Borrower. Indisputably, the loan was closed on November 11, 2005. OCWAN had previously calculated the payoff amount and sent Ameriquest a payoff quote. Ameriquest wire transferred the loan funds to the closing agent on November 18 as provided by the closing documents, and those funds were sufficient to pay Borrower and the OCWAN mortgage balance through November 30. Indisputably, after the wire transfer was completed, the closing agent had the duty to timely transmit payment. Although Borrower alleges that he was later notified that the original mortgage company returned the payoff check as being "short," the evidentiary material indicates that this was not due to any breach of contract or negligence by Ameriquest.[10] Similarly, we find no breach of

---

9. There is some dispute as to the interest rate originally discussed. Although Borrower alleges that it was 8%, Borrower's Acknowledgment of Final Loan Terms indicates that the initial interest rate requested by Borrower was 8.45%.

10. To the contrary, the evidentiary material suggests that OCWAN may have incorrectly calculat-

contract or negligence by Ameriquest in the one-day delay of Borrower's cash disbursement.[11]

¶ 26 Finally, Borrower asserts that a question of fact exists as to whether he signed some of the documents, including the form notifying him of the seven-day right to cancel the loan. However, this Court has previously affirmed the trial court's order which implicitly found that Borrowers had knowledge of their right to rescind.[12] Furthermore, even if a question of fact exists regarding the validity of those signatures and Borrowers' knowledge of their right to rescind, Borrower's claims are not based on that document.

## CONCLUSION

¶ 27 Accordingly, the summary judgment in favor of Ameriquest is affirmed.

¶ 28 AFFIRMED.

RAPP, C.J., and BARNES, J., concur.

ed the payoff amount and then refused to accept payment in accordance with its offer. Alternately, the closing agent, Nations Title, may not have timely transmitted the payoff to OCWAN.

**11.** In fact, an affidavit signed by Nelson indicates that Borrowers knew the closing agent had possession of these funds.

**12.** As noted above, the previously-appealed order found Borrowers "were given another week to rescind the loan for any reason and did not do so," again suggesting collateral estoppel.