**Michael CELI, Plaintiff,**

v.

**TRUSTEES OF PIPEFITTERS LOCAL 537 PENSION PLAN, and The Pipefitters Local 537 Pension Plan, Defendants.**

Civil Action No. 96–10297–GAO.

United States District Court, D. Massachusetts.

July 28, 1997.

Edward J. Dailey, Bromberg & Sunstein, Boston, MA, for Plaintiff.

Katherine A. Hesse, David M. Healey, Kimberly I. McCarthy, Murphy, Hesse, Toomey & Lehane, Quincy, MA, for Defendants.

## FINDINGS, RULINGS and ORDER

O'TOOLE, District Judge.

This matter was tried to the Court sitting without a jury. Upon consideration of the evidence and the arguments of the parties,

the Court makes the following findings of fact and rulings of law.

### Findings of Fact

The plaintiff, Michael Celi, worked as a pipefitter for over seventeen years. He was a participant in two distinct employee benefit plans: the Pipefitters Local No. 537 Pension Plan ("the Pension Plan") and the Pipefitters Local No. 537 Health and Welfare Plan ("the Health and Welfare Plan").

The Pension Plan is a multi-employer defined benefit pension plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Pension Plan is maintained by the Local Union No. 537 of the United Association of Pipefitters and Refrigeration Division, the New England Mechanical Contractors Association, Incorporated, and Air Conditioning & Refrigeration Contractors of Boston, Inc., and all participating employers who are signatory to a collective-bargaining agreement. The Pension Plan provides normal retirement benefits, early retirement benefits, and disability retirement benefits for eligible participants. It does not provide health coverage or other union membership benefits. Those benefits are provided, to some extent, by the Health and Welfare Plan.

The Pension Plan is administered by a Board of Trustees, comprised of six individuals, three chosen by the union and three by the employers. The trustees constitute "the Plan Administrator" for ERISA purposes. They are responsible for determining the process by which employees apply for pension benefits and they resolve any questions arising in connection with interpretation of the Pension Plan. Their decisions in such matters are binding on all employees. Pension Plan § 8.1, as amended in 1987 and 1991, Trial Exs. 2 and 5, respectively.

William Keogh, the pension fund office manager, conducts the day-to-day administrative operations of the Pension Plan and works at the direction and under the supervision of the trustees. He has no authority to make eligibility decisions on behalf of the trustees.

In October 1990, Celi injured his back while working as a pipefitter. Soon after his accident, Celi discussed his injury with Robert O'Toole, a trustee of the Pension Plan and a shop steward at Celi's place of employment. O'Toole suggested that Celi apply for weekly accident and sickness benefits under the Health and Welfare Plan. In November 1990, Celi applied for and began to receive weekly accident and sickness payments under the Health and Welfare Plan. He made no application at this time for disability retirement benefits under the Pension Plan.

Celi received the relatively meager weekly Health & Welfare benefits until April 14, 1991.[1] During this time, Celi also received 30 hours per week of credited service under the Pension Plan, which had the effect of increasing the amount of his normal retirement pension. *See* Pension Plan § 2.4(b), as amended in 1991. He was not eligible to receive both the weekly accident benefits and a disability pension at the same time. Pension Plan, § 5.5, as amended in 1987 and 1991.

Celi testified that Keogh deterred him from applying for disability retirement benefits under the Pension Plan by telling him that he needed to exhaust his weekly sickness and accident benefits under the Health and Welfare Plan before qualifying for a disability pension under the Pension Plan. Celi asserted further that Keogh told him that he had to qualify for and receive a Social Security disability award before becoming eligible for a disability pension. Celi alleges these were actionable misrepresentations, entitling him, retroactively, to disability pension benefits.

Keogh denied Celi's allegations. The Court finds as a matter of fact on the evidence that Keogh did not tell Celi that he had to exhaust the weekly benefits, nor that he had to have received a Social Security disability award before he would qualify for a disability pension.

---

1. The Health and Welfare Plan provides a participant weekly accident and sickness payments for 26 weeks if he has had an industrial accident.

In November 1991, Celi applied for a disability retirement pension from the Pension Plan. The applicable benefit provision entitles an employee to retire on disability pension if he becomes "totally and permanently disabled." Pension Plan § 3.4, as amended in 1987 and 1991. A "total and permanent disability" is a "total disability" that is presumably permanent, as determined by medical evidence. Pension Plan § 1.13, as amended in 1987 and 1991. A "total disability," as defined in the 1987 version of the Pension Plan is "a physical or mental condition for which medical evidence satisfactory to the Trustees has been furnished, which prevents an Employee from engaging in any regular employment *in the industry*, except such employment as is found to be for purposes of rehabilitation, or not incompatible with the finding of total disability." Pension Plan § 1.12, as amended in 1987 (emphasis added). Under the 1991 Pension Plan, "total disability" means "a physical or mental condition for which medical evidence has been furnished to the sole satisfaction of the Trustees, which prevents an Employee from engaging in any regular employment in the trade *or in any other regular gainful employment* which he may be capable of performing, except such employment as is found to be for purposes of rehabilitation, or not incompatible with the finding of total disability." Pension Plan § 1.12, as amended in 1991 (emphasis added).

The trustees considered Celi's application for a disability retirement pension at their January 29, 1992, meeting and approved it effective February 1, 1992, subject to reevaluation in six months. Keogh notified Celi of the trustees' decision by letter dated February 4, 1992.

In July 1993, the trustees sent a notice to all disability pensioners, including Celi, informing them that disability retirement payments would be stopped for any pension recipient who returned to work or who had sufficiently recovered from his disability so that he was able to return to any gainful employment. The notice further requested each recipient to notify the trustees if he was currently employed, noting that not all employment would necessarily disqualify a recipient from receiving a disability pension.

Sometime after he received the notice, Celi asked O'Toole whether the Pension Plan precluded his being employed while he received his pension benefit. O'Toole told him that almost all employment would disqualify him from receiving the disability pension.

In September 1993, Celi submitted to a medical examination at the request of the trustees. The examining physician reported that he believed Celi was employable, but not as a pipefitter. At their November 1993 meeting, the trustees reviewed this medical report, but took no action to discontinue Celi's pension.

In January 1994, Celi began to work as a real estate agent. He did not notify the trustees, who first became aware of Celi's employment when a *Boston Globe* article dated April 1, 1995, reported that Celi had been honored by a real estate company as "rookie of the year" in sales. That same month, Celi wrote to the Pension Plan and requested an increase in the amount of taxes withheld from his disability benefits.

As a result of the *Boston Globe* article, the trustees became concerned that Celi might not be eligible to continue receiving his pension. In June 1995, Keogh requested Celi to furnish copies of his 1993 and 1994 tax returns. Celi sent in his 1993 tax return a short time later. The trustees then directed Keogh to inform Celi that if he did not provide his 1994 tax return, his disability pension would be suspended. Celi then complied. The 1994 tax return indicated that he had earned $25,331.93 from DeWolfe Company, Inc. in 1994. At their July 1995 meeting, after reviewing the tax returns and verifying that Celi was a licensed real estate agent, the trustees voted to terminate Celi's disability pension.

Celi appealed the termination and a hearing was held before the trustees in October 1995, at which Celi and his attorney presented a brief and made an oral presentation. The trustees voted to deny Celi's appeal. In February 1996, Celi commenced this action against the Pension Plan and the trustees.

### Conclusions of Law
#### Misrepresentation

Celi alleges that Keogh misrepresented certain provisions of the Pension Plan to him

so as to deny him benefits he was entitled to, and that the trustees violated ERISA, 29 U.S.C. § 1132(a), by failing to monitor Keogh adequately.[2] Celi's legal theory is that he is entitled to recover damages for the trustees' breach of their fiduciary duty to supervise Keogh. *See Varity Corp. v. Howe,* —— U.S. ——, ——, 116 S.Ct. 1065, 1068, 134 L.Ed.2d 130 (1996). Celi maintains he delayed applying for a disability retirement pension because of Keogh's misrepresentations. He says he is entitled to benefits that he would have received had he not been dissuaded from applying earlier.

The Court has found that Keogh did not make the alleged misrepresentations, and Celi has therefore failed to prove the necessary facts to support his claim for benefits prior to the time of his application on the evidence.

*Termination of the Disability Pension*

Celi's primary claim against the defendants is that the trustees' termination of his disability retirement pension violated the terms of the Pension Plan. He contends that a 1991 amendment to the 1987 Pension Plan was ineffective, so that the trustees improperly terminated his disability pension in July 1995 when they purportedly acted under the Pension Plan as amended. Further, Celi claims that even if the 1987 Pension Plan was properly amended, his disability pension was vested and it could not be decreased or terminated.

■ As to the latter point, disability benefits do not ordinarily vest under ERISA. Accrued benefits, such as retirement benefits, are subject to the vesting requirements of 29 U.S.C. § 1053, while ancillary benefits, such as disability benefits are not. *Cf. Chiles v. Ceridian Corp.,* 95 F.3d 1505 (10th Cir. 1996) (explaining that disability benefits are ancillary benefits which need not ever vest); *see also,* 29 U.S.C. § 1054(g). The key to the vesting of benefits is to reach "normal retirement age." "Each pension plan shall provide

that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age...." 29 U.S.C. § 1053; *see also Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032, 1041 (2d Cir.1985) (suspension of participant's pension benefits did not violate section 1053 where he had not reached normal retirement age as defined in the plan); *Geib v. New York State Teamsters Conference Pension and Retirement Fund,* 758 F.2d 973, 977 (3d Cir.1985) (nonforfeitability provisions of section 1053 do not apply until normal retirement age is reached). Celi has not reached "normal retirement age," and his disability pension was not a vested right.

■ The more substantial issue is whether the trustees' termination of Celi's disability benefits was unlawful. Where the benefit plan gives the trustees "discretionary authority to determine eligibility or to construe the terms of the plan," their decision interpreting and applying pension plan rules will only be set aside if it is arbitrary, capricious, or an abuse of discretion. *Diaz v. Seafarers Int'l Union,* 13 F.3d 454, 456 (1st Cir.1994) (quotations omitted) (*citing Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989)). The Pension Plan here provided the trustees with such discretion. *See* Pension Plan § 8.1(d), as amended in 1987 and 1991.

The plaintiff argues that the provision governing his eligibility for a disability pension was the one in the 1987 Pension Plan, not the amended provision in the 1991 Pension Plan.[3] The argument is actually beside the point. Although the initial eligibility provisions were altered from the 1987 Pension Plan to the 1991 Pension Plan, the provision governing the termination of benefits is identical in both. In both versions, Section 5.3(a) authorizes the termination of benefits:

if the Employee engages prior to age 60 *in any regular gainful occupation or employ-*

---

**2.** *See* 29 U.S.C. § 1132(a)(3) ("A civil action may be brought ... (3) by a participant, beneficiary, or fiduciary ... (B) to obtain other appropriate equitable relief (i) to redress such violations....").

**3.** Under the 1987 language, a participant was eligible for disability pension benefits if he could no longer work "in the [pipefitting] industry." Under the 1991 language, he was ineligible if he could be gainfully employed at any work, not just work in the industry.

*ment for remuneration* or profit (except for purposes of rehabilitation approved by the Trustees, or under circumstances determined by the Trustees to be compatible with the finding of Total and Permanent Disability). Pension Plan § 5.3(a), as amended in 1987 and 1991 (emphasis added).

Because the termination provision in both plans is the same, it does not matter when the 1991 amendment took effect.

█ The question is whether the trustees' termination of Celi's disability pension was arbitrary, capricious, or an abuse of discretion. The plain language of that provision provides that a disability pension *shall* be terminated if the employee engages in *any* regular gainful occupation or employment for remuneration or profit prior to age sixty. Pension Plan § 5.3, as amended in 1987 and 1991. It is not disputed that Celi regularly engaged in employment as a real estate agent beginning in 1994. He earned $25,331.93 from DeWolfe Company, Inc. in 1994. Under § 5.3(a) of the Pension Plan, his retirement disability benefit should have been terminated. The trustees' decision to do so is consistent with the Pension Plan's purpose to provide assistance to those unable to be gainfully employed due to injuries incurred as a pipefitter. Their interpretation of § 5.3(a) of the Pension Plan and their consequent termination of Celi's pension was not arbitrary, capricious, or an abuse of discretion.

### Health & Union Benefits

Celi also claims he is entitled to health care and other similar benefits under the Heath & Welfare Plan that accrue to a disability pension. He requests that these benefits be equitably reinstated. Because his disability pension was properly terminated, he is not a disability pensioner entitled to such health and welfare benefits, and this claim has no merit.

### Documents Claim

█ During his administrative appeal from the termination of his pension, Celi requested certain Pension Plan records, including a copy of the 1987 Pension Plan. The Pension Plan was very slow in sending him the documents, and he did not get them until his litigation was underway. Celi claims that the delay violated ERISA's requirement that the trustees supply certain information promptly when requested. *See* 29 U.S.C. §§ 1132(c)(1)(B), 1024(b)(1). Imposition of penalties for failure to provide documents to participants is committed to the discretion of the court. *See Rodriguez–Abreu v. Chase Manhattan Bank,* 986 F.2d 580, 588 (1st Cir.1993). The Court may properly consider prejudice and bad faith as factors in deciding whether to impose penalties. *Id.*

Celi alleges that he was harmed by not having the 1987 Pension Plan document during his administrative appeal. However, the Court has concluded that the language of the 1987 Pension Plan and 1991 Pension Plan was the same in regard to termination. There was no prejudice to him from the late delivery of the 1987 Pension Plan. Further, the plaintiff has not supplied any evidence that the trustees or Keogh acted in bad faith, as opposed to bureaucratic sloth, in failing to furnish one document. Accordingly, exercising its discretion, the Court declines to impose statutory penalties against the defendants.

### Restitution

█ By its counterclaim, the Pension Plan seeks restitution for the benefits it disbursed to Celi from January 1, 1994 until August 1, 1995, when the trustees terminated his disability pension. *See* 29 U.S.C. § 1132(a)(3) (a civil action may be brought by a fiduciary "to obtain other appropriate equitable relief"); *cf. Kwatcher v. Massachusetts Serv. Employees Pension Fund,* 879 F.2d 957, 967 (1st Cir.1989). The trustees base their claim on both ERISA and federal common law.

█ In *Kwatcher,* the First Circuit held that recovery of contributions "mistakenly made can be attempted under a common-law theory of restitution." 879 F.2d at 967. Other courts have allowed fiduciaries to recover overpayments to beneficiaries pursuant to 29 U.S.C. § 1132(a)(3). *See Trustees of So. Cal. Pipe Trades Trust Fund v. Balliet,* 16 Employee Benefits Cas. (BNA) 1713, 1720–22, 1992 WL 472371 (C.D.Cal.1992) (fund entitled to restitution of benefits from

participant who concealed the fact that he was no longer eligible); *Floor Covering Union v. Tompkins,* 761 F.Supp. 101, 104 (D.Or. 1991) (fund entitled to restitution of benefits from participant who failed to notify trust of his change in employment). It is irrelevant whether "the reason for the unjust enrichment is an innocent mistake or a material misrepresentation." *Tompkins,* 761 F.Supp. at 104 (citing *Restatement of Law of Restitution* § 28(b) (1936)).

The Pension Plan's August 1993 letter advised Celi that he had to report any gainful employment. Celi failed to notify the Pension Plan when he began working as a real estate agent in January 1994, and he later delayed providing his 1994 tax returns to the Pension Plan, when requested. The consequence of his failures to disclose this information resulted in the improper extension of his disability pension payments. The prevailing view, as demonstrated by the cases cited above, is that a person receiving benefits he is not entitled to must make restitution to the Plan in the amount of those benefits. For Celi, this means all benefits received after January 1, 1994.

The Pension Plan did not present evidence of the total benefits Celi received during 1994 and the seven months in 1995 that he received benefits while working as a real estate agent. The February 1992 letter from the Pension Plan to Celi stated that his disability pension was to be $1,279.50 per month. For nineteen months, the total paid at this rate would have been $24,310.50. The Court finds that the Pension Plan is entitled to restitution from Celi in that amount.

 The Pension Plan has also requested prejudgment interest and costs. An award of prejudgment interest and costs is placed in the discretion of the trial court. *See Cottrill v. Sparrow, Johnson & Ursillo, Inc.,* 100 F.3d 220, 223 (1st Cir.1996). In order to compensate the Pension Plan for its loss of the use of the benefits paid to Celi, the Court orders costs and allows for prejudgment interest at the federal rate from the filing of the counterclaim.[4]

---

4. The Massachusetts statutory interest rate, which has not been adjusted in many years, overstates the loss of the use of money. The federal statutory rate is more appropriate than the Massachusetts rate, especially in an ERISA restitution claim.

*Attorney's Fees*

 The Pension Plan has also requested attorney's fees pursuant to 29 U.S.C. § 1132(g)(1), which provides that in any ERISA claim advanced by a "participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs" to the prevailing party. In deciding this question, the court should balance the following factors: "(1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions." *Cottrill,* 100 F.3d at 225.

The Court does not find that Celi acted in bad faith in believing that he could receive a disability pension while working as a real estate agent, but instead misjudged the Pension Plan's legal benefits. *See id.* Further, Celi does not appear to have the deep pockets to pay such an award. Although such an award of attorney's fees may deter others from acting similarly under the circumstances, the Court finds, in its discretion, the other factors stated in *Cottrill* outweigh the deterrence that an award of attorney's fees to the Pension Plan would provide in this case. Therefore, the Pension Plan's request for attorney's fees is denied.

*Conclusion*

On the complaint, judgment shall be entered for the defendants on all counts.

On the counterclaim, judgment shall be entered for the Pension Plan in the amount of $24,310.50 plus prejudgment interest at the federal rate.

IT IS SO ORDERED.