William J. PAUPST, Petitioner,

v.

PENNSYLVANIA MUNICIPAL
RETIREMENT BOARD,
Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 17, 2001.
Decided Nov. 21, 2001.

Travis J. Thompson, Richboro, for petitioner.

Letitia Ann Dyer, Harrisburg, for respondent.

Before SMITH, Judge, KELLEY, Judge, and JIULIANTE, Senior Judge.

JIULIANTE, Senior Judge.

William J. Paupst (Paupst) petitions for review from the January 18, 2001 order of the Pennsylvania Municipal Retirement Board (Board) that denied his application for service-connected disability benefits. We are asked to consider whether Paupst, a participating member of the Pennsylvania Municipal Retirement System (PMRS), is entitled to receive disability pension benefits where he is permanently disabled from performing his duties as a police officer but is otherwise capable of gainful employment. We affirm.[1]

---

1. On review, we are limited to determining whether constitutional rights were violated, an error of law was committed, or whether the necessary findings of fact are supported by substantial evidence. *Green v. Pennsylvania Mun. Ret. Bd.*, 678 A.2d 432 (Pa.Cmwlth. 1996).

Plumstead Township (Township) is a second class township located in Bucks County. Pursuant to Section 1 of what is commonly called Act 600, Act of May 29, 1956, P.L. (1955) 1804, *as amended,* 53 P.S. § 767, the Township passed Ordinance Number 10–16–84 creating a police pension fund in 1984.

On February 20, 1990, the Township hired Paupst as a full-time police officer. (Finding of Fact "F.F." 3) While Paupst was so employed, the Township Board of Supervisors (Supervisors) and the Township Police Benevolence Association were parties to a collective bargaining agreement (CBA), effective January 1, 1993. (F.F.17, 18) The CBA governed the conditions and terms of Paupst's employment with the Township, including the conditions and terms of his pension plan. (*Id.*)

By Ordinance Number 3–16–93A, the Township enrolled in the PMRS under Article IV of the Pennsylvania Municipal Retirement Law (Law) [2] in 1993. (F.F. 20; Reproduced Record "R.R." 57a–63a) In order to enroll in the PMRS, at least seventy-five percent of the Township's police pension fund members had to indicate that they were in agreement with the transfer of their pensions to the PMRS. (Section 402 of the Law; [3] F.F. 21) On March 16, 1993, the Township executed its police pension fund agreement (Agreement) with the PMRS, effective January 1, 1994. (F.F.20, 21)

On January 4, 1994, Paupst slipped and fell on ice during the course of his employment and, as a result, tore his medial and lateral meniscus in his left knee. (F.F.4) Paupst's filed a claim petition for workers' compensation benefits and ultimately re-ceived a total of $33,441.86 in benefits. (F.F.7)

On January 21, 1997, the Supervisors found that Paupst was injured during the scope and course of his employment when he suffered a permanent injury to his knee. (F.F.5) The Supervisors further concluded that Paupst's injury left him totally disabled from performing the duties and functions of a police officer and, accordingly, they discharged him. (F.F.6, 8)

Thereafter, Paupst filed an application with the PMRS for a service-connected disability pension. By letter dated July 27, 1998, the PMRS denied Paupst's application because its examining physician opined that Paupst was capable of gainful employment as of January 21, 1997, the date of his discharge. (F.F.12) Since that time, Paupst has been gainfully employed and earned approximately $40,000.00 per year. (F.F.24)

Paupst appealed the denial of his application to the Board. Upon consideration, the Board adopted the hearing examiner's findings of fact and conclusions of law as its own. Thus, it concluded that because Paupst was capable of gainful employment, he was not eligible for a disability pension. This appeal followed.

■ Article IV, Section 403(4) of the Law,[4] provides that contracts between a municipality and the PMRS must specifically state the provisions relating to the types and amounts of disability retirement benefits for which a member may become eligible, and the qualifications therefor. In conjunction with Section 403(4), Section 411 of the Law governs disability retirement. Subsection (a) provides that:

> [a]fter a member has had the required number of years of total service as stat-

---

**2.** Act of February 1, 1974, P.L. 34, *as amended,* 53 P.S. §§ 881.101–881.501.

**3.** 53 P.S. § 881.402.

**4.** 53 P.S. § 881.403(4).

ed in the contract, he may, upon application ... be retired by the [B]oard on a disability allowance if he is under superannuation retirement age, and on a superannuation retirement allowance if he has attained or passed such age, if the physician designated by the [B]oard, after medical examination of the member ... shall certify to the [B]oard that the member is unable to engage in any gainful employment and that said member ought to be retired. Where the disability of a member is determined to be service-connected, as defined in this act, no minimum period of service shall be required for eligibility. ...

53 P.S. § 881.411(a).

Section 6 of the Agreement provides that a member who has more than ten years of credited service may, upon application, be retired on a disability pension if the Board physician certifies that the member is unable to engage in any gainful employment and ought to be retired. (F.F. 22; R.R. 58a) Section 6 further provides that where the disability is determined to be service-connected, no minimum period of service is required for eligibility. (*Id.*) When read together, the Law and the Agreement provide that a member, with either ten years of service or a service-connected disability, may be eligible for a disability pension where the Board's physician certifies that the member is unable to engage in any gainful employment and should be retired.

Paupst contends that he is eligible for a service-connected disability because he met the criteria under Section 102 of the Law[5] since his disability was found to be work-related and he received workers' compensation benefits. The term "service-connected disability" is defined as the "total and permanent disability of a member prior to eligibility for superannuation retirement resulting from a condition arising out of and incurred in the course of his employment, and which is compensable under the [Workers' Compensation Act[6]] or [The Pennsylvania Occupational Disease Act.[7]]" Section 102 of the Law.

That term, as it relates to disability retirement pursuant to Section 411 of the Law, is relevant only to the minimum period of service required for eligibility of benefits. Under Section 411, an applicant must undergo a medical examination by a Board-designated physician to determine if the applicant is able to engage in any gainful employment regardless of whether the disability is service-connected. In other words, a service-connected disability does not automatically entitle an applicant to benefits; the decisive factor under Section 411(a) is whether the applicant is unable to engage in any gainful employment.

Thus, we approach the crux of Paupst's argument: whether the term "disability" should be defined as that which renders him incapable of *performing his duties as a police officer,* as opposed to that which renders him incapable of *any gainful employment.* In support of his position, Paupst cites *Ridley Park Police v. Borough of Ridley Park,* 105 Pa.Cmwlth. 474, 524 A.2d 998 (1987).

In 1985, the Borough of Ridley Park (Borough) and the fraternal order of police (FOP) entered into negotiations for a new CBA and reached an impasse over the definition of "disability" for purposes of pension entitlement. At least since 1976, the CBA provided that a police officer was

---

5. 53 P.S. § 881.102.

6. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4.

7. Act of June 21, 1939, P.L. 566, *as amended,* 77 P.S. §§ 1201–1603.

entitled to a disability pension if the officer was "permanently and totally disabled from performing police work for the Borough." *Id.* at 999. The FOP wanted to retain that language in the new CBA; conversely, the Borough insisted that disability be defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." *Id.*

An arbitration panel found in favor of the Borough and the FOP appealed to the court of common pleas. The court of common pleas struck down the panel's definition, and the Borough appealed to this Court. On appeal, the Borough argued that Section 1 of Act 600 did not prohibit such a definition of disability.

Section 1 of Act 600 authorized the Borough to establish a police pension and to prescribe its terms and conditions. To that extent, the Borough's pension plan was governed by The Borough Code (Borough Code).[8] Section 1190 of the Borough Code provided that "[n]o person employed in any police or fire force of any borough shall be suspended, removed or reduced in rank except for the following reasons: (1) Physical or mental disability affecting his ability to continue in service, in which cases the persons shall receive an honorable discharge from service." Section 1190 of the Borough Code.[9]

The Borough argued that police officers covered under the PMRS could retire on a disability pension only if they were unable to engage in any gainful employment and that the PMRS definition of disability should apply to borough officers as well. We rejected this position, citing our previous decision in *Crawford v. Borough of Lewisburg*, 42 Pa.Cmwlth. 260, 401 A.2d

385 (1979). In *Crawford*, we interpreted the language "affecting his ability to continue in service" in the Borough Code to mean that the Legislature "intended the disability to be one which rendered the officer incapable of performing *his normal duties permanently.*" *Crawford*, 401 A.2d at 388 (emphasis added). Therefore, we concluded in *Ridley Park* that because the Borough Code controlled, any alternate definition would be inappropriate.

Presently, Paupst contends that we should apply the definition of "disability" as determined in *Ridley Park* because Section 2 of what is commonly referred to as the Police Tenure Act,[10] like the Borough Code, provides that a regular full-time police officer of second class townships may not be removed from service except for a physical or mental disability affecting his ability to continue in service. In *Ridley Park*, the disability pension was governed by the Borough Code and the terms of the CBA. Presently, however, the Township and the PMRS have entered into an agreement governing disability pensions of PMRS members, which is controlling. The Agreement and the Law require that an applicant be unable to engage in any gainful employment; they do not limit job opportunities to only that type of work performed before impairment.

Although the Agreement and the Law do not define "gainful employment," Black's Law Dictionary defines it as "[w]ork that a person can pursue and perform for money." BLACK'S LAW DICTIONARY, 544 (7th Ed.1999). Other jurisdictions have recognized that gainful employment is work performed for remuneration. *See Celi v. Trustees of Pipefitters Local 537 Pension Plan*, 975 F.Supp. 23 (D.Mass.

---

**8.** Act of February 1, 1966, P.L. (1965) 1656, *as amended,* 53 P.S. §§ 45101–48501.

**9.** 53 P.S. § 46190.

**10.** Act of June 15, 1951, P.L. 586, *as amended,* 53 P.S. § 812.

 

1997) (pension plan was amended to provide that a participant was ineligible for disability pension if he could be gainfully employed in any work, not just work in the pipefitter industry); *Johnson v. Publ. Employees Ret. Ass'n of New Mexico,* 126 N.M. 282, 968 P.2d 793 (Ct.App. 1998)(where Section 10–11–10.1(O)(2) of the New Mexico Statutes defined "gainful employment" as "remunerative employment or self-employment that is commensurate with the applicant's background, age, education, experience and any new skills or training the applicant may have acquired after terminating public employment or incurring the disability," disabled sheriff's deputy was gainfully employed as security guard if pension board found he was capable of such employment); *LaBelle v. State Employees Ret. Sys. of Illinois,* 265 Ill.App.3d 733, 202 Ill.Dec. 766, 638 N.E.2d 412 (1994)(Retirement System Board defined "gainful employment" as "any remuneration which exceeds $500.00 in any month"); *Cleland v. Corrections Officer Ret. Plan,* 169 Ariz. 252, 818 P.2d 237 (Ct.App.1991)(pension fund manager's definition of gainful employment as "the capability of performing a moderate amount of work with reasonable regularity, or more specifically, at least four (4) hours of work four (4) days per week for which the claimant earns at least $300 monthly and/or the minimum hourly wage" was reasonable).

As that term is commonly used, the Board's conclusion that Paupst was gainfully employed because he earned approximately $40,000.00 per year since 1997 is supported by the record. Therefore, the Board properly denied his application for disability pension benefits.

And finally, Paupst contends that the Board and Township have the authority to enter into optional retirement plans under Section 104(11) of the Law.[11] While this may be true, they have chosen not to do so. The Township, with approval of seventy-five percent of its pension members, and the PMRS entered into a contract for enrollment into the retirement system under Article IV of the Law. Both the Law and the Agreement, which are binding on the Township, the PMRS, and the police officers, provide that an applicant must be unable to engage in any gainful employment to be considered eligible for a disability pension.

Accordingly, we affirm.

### ORDER

AND NOW, this 21st day of November, 2001, the January 18, 2001 order of the Pennsylvania Municipal Retirement Board is hereby AFFIRMED.