Vivian DICKERSON, Plaintiff

v.

PRUDENTIAL LIFE INSURANCE COMPANY OF AMERICA, Defendant.

Civil Action No. 06–10628–WGY.

United States District Court, D. Massachusetts.

Sept. 2, 2008.

Jonathan M. Feigenbaum, Phillips & Angley Boston, MA, for Plaintiff.

Carey Louise Bertrand, William T. Bogaert, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Norah K. Mallam, Cornell & Gollub, Boston, MA, for Defendant.

*MEMORANDUM OF DECISION*

WILLIAM G. YOUNG, District Judge.

## I. INTRODUCTION

Vivian Dickerson ("Dickerson") brings this suit against the Prudential Insurance Company of North America ("Prudential") pursuant to the Employee Retirement Income Security Act ("ERISA"). She alleges Prudential wrongfully terminated her long-term disability benefits, violated provisions of ERISA relating to full and fair review and notice, and withheld documents it was obligated to give her upon request. Dickerson and Prudential, after filing their respective motions for summary judgment, agreed to permit this Court to resolve their dispute as a case stated. This is a particularly effective and efficient device when a court is faced with cross-motions for summary judgment. *See United Cos. Lending Corp. v. Sargeant*, 20 F.Supp.2d 192, 195 (D.Mass.1998). When deciding a case stated, a court "draw[s] such inferences as are reasonable to resolve the case" rather than drawing all inferences against each moving party as it would when evaluating cross-motions for summary judgment. *Id.* The court also "may decide[ ] any significant issues of material fact." *Cont'l Grain Co. v. Puerto Rico Mar. Shipping Auth.*, 972 F.2d 426, 430 n. 7 (1st Cir.1992).

## II. FINDINGS OF FACT

For almost sixteen years, Dickerson worked full time as a telephone advertisement salesperson at the Boston Globe. Pl.'s S. Of Undisp. Facts in Supp. of Mot. for Summ. J. ("Pl.'s State.") [Doc. 27] ¶ 1. As a Boston Globe employee, Dickerson had the opportunity to participate in a long-term disability insurance plan ("the Plan"). *See* Def.'s S. of Undisp. Facts in Supp. of Mot. for Summ. J. ("Def.'s State.") [Doc. 24 Ex. 2] ¶ 1. The Plan is underwritten and administered by Prudential, *id.* ¶ 2, and is governed by ERISA, *id.* ¶ 1.[1]

Dickerson ceased working at the Boston Globe in September 1999 due to eye conditions, including edema, glaucoma, sarcoidosis, and uveitis, that caused vision problems including blindness in her left eye. Pl.'s State. ¶¶ 7–10. Shortly after leaving her position, Dickerson applied for long-term disability benefits. Def.'s State ¶ 7. Prudential approved her application,[2] and Dickerson began receiving benefits in December 1999. *Id.* ¶ 9.

In January 2000, Prudential referred Dickerson to the Social Security Law Group and agreed to pay any fees charged by the firm in its efforts to help Dickerson obtain Social Security benefits. Pl.'s

---

**1.** *See* 29 U.S.C. § 1002(1).

**2.** At the time it approved her application, Prudential agreed that Dickerson was "totally disabled" as that term was defined in the Plan. According to the Boston Globe's insurance contract:

" 'Total Disability' exists when Prudential determines that all of these conditions are met:

(1) Due to Sickness or accidental Injury, both of these are true:

(a) You are not able to perform, for wage or profit, the material and substantial duties of your occupation.

(b) After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience. The Initial Duration is shown in the Schedule of Benefits.

(2) You are not working at any job for wage or profit.

(3) You are under the regular care of a Doctor."

Admin R. at 437. The schedule of benefits included with the Boston Globe's insurance contract stated that the "initial duration" was from time of disability until age sixty-five. Admin. R. at 428.

State. ¶¶ 30–32. An administrative law judge ("hearing officer") ultimately concluded that Dickerson was disabled as that term is defined in the Social Security Act and awarded her benefits.[3] *Id.* ¶ 33.

In February 2004, Dickerson received a letter from Prudential in which it indicated it was terminating her long-term disability benefits because Dickerson's condition no longer satisfied the definition of total disability put forth in the Plan.[4] Admin. R. at 368–69. In support, Prudential stated that Dickerson's treating physician, Dr. David Lotufo, indicated that Dickerson could return to work with accommodations for her eye condition. *Id.* at 368. Dr. Lotufo elaborated that, although Dickerson was blind in her left eye, her right eye was stable with 20/30 vision. *Id.* at 369. After learning of these facts, Prudential conducted a transferable skills analysis as well as a labor market survey. *Id.* It told Dickerson that the results of these studies indicated that there were a number of jobs in her area in which she could work given her education, training, experience, and limitations, including as a telephone sales representative. *Id.* Prudential concluded the letter by indicating it would continue to pay benefits to Dickerson until April 30, 2004, offering her job placement services, and instructing Dickerson on how to appeal its determination. *Id.*

Dickerson appealed Prudential's decision on June 1, 2004. Def.'s State. ¶ 22. After reviewing additional information from Dickerson's physicians, *id.* ¶ 22–23, Prudential upheld its original determination in a letter dated September 13, 2004. Admin. R. at 354–357. In this letter, Prudential listed the information upon which it had relied during the reconsideration, including:

(1) A January 2001 phone conversation with Dr. Lotufo in which he indicated Dickerson might be able to return to work in six months to one year;

(2) An April 2003 "Attending Physician Statement" completed by Dr. Lotufo that "note[d] that [Dickerson] might be able to return to work with accomodations";

(3) A January 2004 "Work Status Form" completed by Dr. Lotufo, which indicated the condition of Dickerson's right eye was functional and stable and "noted that [Dickerson was] capable of medium work capacity with use of protective eyewear";

(4) A follow-up conversation with Dr. Lotufo that confirmed Dickerson had 20/30 vision in her right eye;

(5) Medical records from Dr. Lotufo as well as two other physicians; and

**3.** The hearing officer found that Dickerson suffered from severe impairments including uveitis, macular edema, glaucoma, cataracts, arthritis of the knees, total loss of vision in the left eye, and partial loss of vision in the right eye. Hearing Officer Determination [Doc. 1 Ex. A] at 6. The hearing officer also found that Dickerson was capable of lifting ten to fifteen pounds, sitting, and walking with a cane, but that her eye pain limited her concentration. *Id.* The hearing officer concluded that, considering Dickerson's physical limitations and background, she could "not make an adjustment to work that exists in significant numbers in the national economy." *Id.* She accordingly qualified as disabled. *Id.*

**4.** The letter recited the definition of total disability, but it differed from the definition present in the group insurance contract in one respect. The Boston Globe's contract states, in section 1(b), that "[t]he Initial Duration is shown in the Schedule of Benefits." Admin. R. at 437. The schedule of benefits, meanwhile, indicates that the initial duration does not expire until a claimant reaches the age of sixty-five. *Id.* at 428. The definition recited in the February 24 letter, however, provided in section 1(b) that "[t]he Initial Duration is equal to the first 24 months of benefit." *Id.* at 368.

(6) The existence of "[s]everal alternate, gainful occupations that [Dickerson] would be capable of performing" that were identified by the Transferable Skills Analysis and Labor Market Survey.

Admin R. at 355–56. Prudential noted that Dickerson alleged in her appeal letter that she suffered from rheumatoid arthritis, which made it difficult for her to walk, as well as diabetes. Prudential also acknowledged receipt of medical records pertaining to those conditions from Dickerson's treating physician, Dr. Elizabeth Roth. *Id.* at 356. Prudential agreed that Dickerson's arthritis precluded her from working in positions that require prolonged standing or walking, but it stated that it found no indication in the medical records that Dickerson would be restricted from "sit[ting] for prolonged periods of time, perform[ing] repetitive movements of [her] hands, and ... typ[ing] and/or mous[ing]." *Id.*

Dickerson requested from Prudential the documents that were used to review her claim on November 8, 2004; Prudential provided the documents to her on January 3, 2005.[5] Def.'s State. ¶¶ 28–29. On April 4, Dickerson told Prudential, via her attorney, that she would be pursuing a second appeal and submitting additional documentation for that purpose. *Id.* ¶ 30. Prudential indicated it was willing to reconsider its determination upon submission of such material. *Id.* ¶ 32. On April 6, 2006, however, Dickerson filed suit in this Court without ever submitting additional

documentation or pursuing her second appeal. *Id.* ¶ 37.

## III. RULINGS OF LAW

### A. Challenge to a Denial of Benefits Pursuant to 29 U.S.C. § 1132—Standard of Review

■ A participant in an insurance plan governed by ERISA, such as Dickerson, may bring a civil action to recover benefits due under the terms of the plan, to enforce rights under the terms of the plan, or to clarify rights to future benefits under the terms of the plan.[6] 29 U.S.C. § 1132(a)(1)(B). When a participant challenges an administrator's decision to deny benefits under section 1132(a), a court should review that decision de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan does vest an administrator with discretion, however, the court applies an arbitrary and capricious standard of review. *See id.; Brigham v. Sun Life of Canada,* 317 F.3d 72, 81 (1st Cir.2003).

"[T]here remains considerable debate over what language constitutes a sufficiently clear grant of statutory authority to transform judicial review from de novo to deferential." *Brigham,* 317 F.3d at 81. Because "there are no magic words," courts must carefully examine the language of the plan before settling on a

---

5. Dickerson made a second request for documents on April 4, 2005, when she requested a copy of her entire file from Prudential. Def.'s State. ¶¶ 30–31. Prudential responded by telling Dickerson it had already provided her with her entire file in response to the January document request. *Id.* ¶ 33. After Dickerson again requested a complete copy of her file, Prudential provided one in May 2005. *Id.* ¶ 36.

6. Prior to the passage of ERISA, claims regarding employees' entitlement to benefits were litigated before courts and juries just as any other breach of contract claim. *See* Mark D. DeBofsky, *What Process is Due in the Adjudication of ERISA Claims?,* 40 J. Marshall L.Rev. 811, 811 (2007).

standard of review. *Id.* One criterion to consider is whether the language of the plan gives participants notice that the plan administrator has been vested with discretion. *See Diaz v. Prudential Ins. Co. of Am.,* 424 F.3d 635, 637 (7th Cir.2005). If the plan simply indicates the administrator will decide a participant's eligibility for benefits based upon proof provided, the language does not give sufficient notice that the administrator's "judgment [is] largely insulated from judicial review by reason of being discretionary." *Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 332 (7th Cir.2000); *see also Diaz,* 424 F.3d at 639. De novo review thus would be appropriate.

An order granting Dickerson's motion for de novo review of the termination of long-term disability benefits entered in this case on July 31, 2007. Order on De Novo Review [Doc. 21] at 1, 4. Although Prudential has the power to determine whether a participant is totally disabled, it must do so in "accordance with objective standards" based on the participant's medical condition. *See Nichols v. Prudential Ins. Co. of Am.,* 406 F.3d 98, 109 (2nd Cir.2005). "Because the Plan language suggests that 'the plan administrator is to make a judgment within the confines of pre-set standards [and does not have] the latitude to shape the application, interpretation and content of the rules in each case,'" de novo review is appropriate here. Order on De Novo Review at 4 (quoting *Diaz,* 424 F.3d at 637–40).

## B. Entitlement to Benefits

Before she may prevail on a claim of wrongful termination of benefits, a claimant must demonstrate that she is disabled within the terms of the applicable plan. *See Orndorf v. Paul Revere Life Ins. Co.,* 404 F.3d 510, 519 (1st Cir.2005). Where, as here, the Court conducts a de novo review of a denial of benefits, the Court "independent[ly] weighs the facts and opinions in the record to determine whether the claimant has met [t]his burden." *Id.*

The Plan provides two different standards by which to judge whether a claimant is totally disabled. The first, which is applied during the so-called "initial duration," asks simply whether the claimant is unable to perform the "material and substantial duties" of her own occupation. Admin. R. at 437; *see also* Admin. R. at 354, 368. The second, which is applied after the initial duration expires, asks whether the claimant can perform the duties of *any* job. *Id.* Dickerson asserts the termination of her benefits was wrongful because Prudential incorrectly relied upon the latter, rather than the former, standard when evaluating her status.[7]

■ Assuming this is true,[8] Prudential's use of an overly broad definition of "Total Disability" does not, standing alone, entitle Dickerson to a reinstatement of benefits. Dickerson must *also* demonstrate that she is disabled under the correct standard and thus actually entitled to receive benefits.

---

**7.** In its letters to Dickerson, Prudential stated that the initial duration was 24 months. Admin. R. at 354, 368. Were this the case, Prudential would be correct to utilize the broader definition because Dickerson had received benefits for much longer than 24 months at the time the decision to terminate her benefits was made. The schedule of benefits accompanying the Boston Globe's policy, however, states that the initial duration lasts until the claimant reaches age sixty-five. Admin. R. at 428. As Dickinson was born in 1952, Admin. R. at 93, it is clear this benchmark has not yet been reached.

**8.** Prudential asserts that it "ultimately found that Ms. Dickerson was capable of performing the material and substantial duties of her own occupation as a Telephone Advertising Salesperson." Def.'s Mem. in Opp. of Summ. J. [Doc. 31] ("Def.'s Mem. in Opp.") at 5.

After a thorough review of the record, the Court concludes that Dickerson has not shown that she is unable to perform the "material and substantial duties" of her own occupation and thus that she has not carried her burden.

■ As an initial matter, this Court rejects Dickerson's contention that the determination by a hearing officer that she is disabled for purposes of the Social Security Act is sufficient to require a ruling that she is entitled to benefits under the Plan. *See* Pl.'s Mem. in Supp. Mot. for Summ. J. [Doc. 26] ("Pl.'s. Mem. in Supp.") at 15–16; Pl.'s Mem. in Opp. of Summ. J. [Doc. 28] ("Pl.'s Mem. in Opp.") at 9. Certainly, a hearing officer's determination of disability may be considered as relevant evidence of a participant's disability claim. *Pari–Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 419–20 (1st Cir.2000). Neither this Court nor a plan administrator, however, is bound by a hearing officer's determination of disability when deciding whether a participant is entitled to benefits under a plan. *See id.* at 419–20. First, a hearing officer is generally bound to defer to the claimant's treating physician, whereas a plan administrator is not. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). More importantly, the definitions of disability under the Social Security Act and any given plan are not necessarily congruent; where this is

the case, such as here, the probative value of a Social Security determination of disability is reduced. Finally, the hearing officer declared Dickerson disabled based on her condition several years prior to Prudential's decision to terminate benefits. *See* Hearing Officer Determination at 7 (giving date of decision). Thus, the hearing officer obviously did not take into account any changes in Dickerson's condition or her physician's opinion about her ability to work that occurred in the interim. This further undermines the relevance of the hearing officer's determination. Accordingly, the Court notes the hearing officer's decision but does not accord it great weight when deciding the issue before it.[9]

That said, a review of the record provides substantial evidence that Dickerson was no longer disabled, even under the standard she asserts applies to her, at the time Prudential terminated her benefits. Dickerson characterized her duties in her position at the Boston Globe as using a computer, talking on the telephone, and fingering a keyboard on a cumulative basis for about seven and a half hours a day. Pl.'s State. ¶ 5. The medical information contained in the record fails to support the Dickerson's argument that she is unable to perform these duties today. First, Dr. Lotufo, the physician treating Dickerson for her eye condition, stated that, although her left eye was blind, Dickerson's right

---

**9.** Dickerson also asserts that Prudential should be estopped from now arguing that she is not disabled because it assisted Dickerson in her application for Social Security benefits and then "received the advantage of reducing monthly benefits to Mrs. Dickerson under the SSDI offset in the insurance policy" as a result of the hearing officer's disability determination. Pl.'s Mem. in Supp. at 15. The First Circuit, however, recently rejected virtually identical reasoning. *See Morales–Alejandro v. Medical Card Sys., Inc.*, 486 F.3d 693, 699 (1st Cir.2007) ("Morales also contends that the MCS was required to give the

disability ruling by the Social Security Administration controlling weight because MCS required him to apply for social security benefits and then to reimburse the Plan for the amount he received from social security. Contrary to Morales's argument, however, 'benefits eligibility determinations by the Social Security Administration are not binding on disability insurers.' Morales offers no persuasive authority to support his theory that as a result of MCS's reimbursement requirement the social security ruling must be given controlling weight in MCS's decision-making process.") (internal citation omitted).

eye was "functional and stable." Admin. R. at 175. He then indicated that Dickerson would be able to return to work if she wore protective eyewear.[10] *Id.* In a follow-up telephone call, Dr. Lotufo stated that Dickerson's right eye had 20/30 visual acuity, *id.* at 322, which the Court notes is quite close to "normal" 20/20 vision. Furthermore, although Dickerson also complained of rheumatoid arthritis, diabetes, and obesity, the records submitted by Dr. Roth indicate only that Dickerson has resultant difficulty walking and standing.[11] They do not state that Dickerson would be unable to sit, type, use a mouse, or talk on the telephone. *See id.* at 235–62.

Furthermore, the studies conducted by Prudential revealed that there were positions available in Dickerson's area that appear indistinguishable in any significant respect from the position Dickerson held at the Boston Globe. *See id.* at 180–81 (reporting multiple instances of open "tele-phone sales representative" positions). As an initial matter, the relevant positions identified by the labor survey are billed as "telephone sales representative," and Dickerson describes her job as that of a "telephone sales professional," Pl.'s State. ¶ 5. These job titles are fairly straightforward, and reason dictates that there is no significant difference in the "material and substantial duties" one is asked to perform as a telephone sales representative at one company versus another. Indeed, Dickerson does not even attempt to argue that these telephone sales representative positions identified by Prudential's labor survey encompass duties that differ in any meaningful respect from those of her position at the Globe.

In fact, Dickerson's sole basis for differentiating these jobs is to point out that they pay approximately $10,000 a year less than what she earned while working at the Globe and to make a conclusory

**10.** The Court flatly rejects Dickerson's argument that Prudential "took gross liberties" in interpreting how Dr. Lotufo completed the Work Status Form. The form reads, in relevant part:

> ___ The employee WILL BE ABLE TO return to work after a period of:
> ___ Treatment
> Type of Treatment
> Duration of Treatment
> ___ Physical Conditioning
> Type of exercise
> Frequency and duration of exercise sessions
> # of weeks exercise required

Admin. R. at 175–76 (Dr. Lotufo's handwritten additions omitted). Thus, the form presents a general statement—that the employee will be able to return to work—and two alternative scenarios from which the physician is to choose if that is the case. Here, Dr. Lotufo did not, as Dickerson points out, check the first box next to "The employee WILL BE ABLE...." He did, however, check the box directly under that, which corresponds to "Treatment." He also wrote by hand his direction that Dickerson wear protective eyewear at all times. *Id.* at 175.

Given the fact that the box Dr. Lotufo checked clearly is a subset of the more general statement that "[t]he employee WILL BE ABLE TO return to work," Dr. Lotufo's failure to check the first box appears to be merely an oversight. This is especially true because Dr. Lotufo indicated in the past that Dickerson would probably be able to return to work with accommodations, *id.* at 322, and that Dr. Lotufo told Prudential after completing this form that Dickerson's vision in her right eye was 20/30, *id.*

**11.** Dr. Roth did state that Dickerson had difficulty reading and decreased depth perception. This, however, does not appear to be a medical diagnosis; it appears in the portion of the report wherein Dr. Roth recites the information and symptoms reported to her by Dickerson. Admin. R. at 235. Furthermore, the remainder of Dr. Roth's records focus on Dickerson's other ailments, not her eye condition. *See id.* at 235–62. Thus, this isolated comment in the records submitted by Dr. Roth does nothing to undermine the opinion of Dr. Lotufo—an opthomologist who specifically focused on treating Dickerson's eye ailments—regarding her suitability for work.

assertion that this makes the positions inherently uncomparable. Pl.'s Mem. in Supp. at 14. This argument is meritless. The definition of "Total Disability" that Dickerson asserts applies to her does not turn on whether the claimant can perform the duties of a job that pays a salary similar to her previous position. The standard is simply whether the claimant can perform the "material and substantial duties" of her occupation. Admin R. at 437.

In sum, after de novo review of the record, the Court concludes that the evidence demonstrates Dickerson is able to perform the primary duties of the job she held at the Boston Globe, which include sitting, using a computer, talking on the telephone, and typing. Furthermore, the Court concludes that there are positions available in her area that call upon her to perform the same duties, albeit at a lower rate of pay. Dickerson has not met her burden of demonstrating that she is disabled even under the more restrictive definition she asserts applies to her by virtue of being unable to perform the "material and substantial duties" of her own occupation as a telephone sales representative. Accordingly, the Court must uphold the termination of benefits.

## C. Entitlement to Full and Fair Review

■ An employee benefit plan shall "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review ... of the decision denying the claim." ERISA § 503, 29 U.S.C. § 1133(2). Dickerson argues Prudential failed to comply with this requirement because it used the wrong definition of "Total Disability" when evaluating her eligibility for benefits and included that incorrect definition in the February and September 2004 notice letters. See Pl.'s Mem. in Supp. at 13; Pl.'s Mem. in Opp. at 2–4. In order to be eligible for

relief as a result of any section 503 violation, however, Dickerson must prove she suffered actual prejudice. *DiGregorio v. Hartford Comprehensive Employee Ben. Serv. Co.*, 423 F.3d 6, 16 (1st Cir.2005) (holding actual prejudice requirement applies to claims brought for both defective notice under section 503(1) and for lack of full and fair review under section 503(2)). Dickerson cannot do so. Because she cannot demonstrate that she is entitled to benefits even under the more restrictive definition of "Total Disability," she cannot demonstrate that there would have been a different outcome had Prudential utilized the standard Dickerson asserts applies to her or included it in the notices she received. *See Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir.1998) ("[The plaintiff] has failed to demonstrate the prejudice that [is] required. [He] has not presented any evidence that implies a different outcome would have resulted had the notice been in formal compliance with the regulations. As a result, Terry has not shown that alleged defect abridged his right to 'a full and fair review....'").

## D. Defective Notice

■ Dickerson also asserts that Prudential failed to comply with 29 U.S.C. § 1133(1) and 29 C.F.R. § 2560.503–1(g). Pl.'s Mem. in Supp. at 12–13. Section 1133(1) provides, in relevant part:

[E]very employee benefit plan shall ... provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant ....

ERISA § 503(1), 29 U.S.C. § 1133(1). The federal regulation cited by Dickerson builds upon the general requirements of

section 1133 by requiring that the claimant be given written notice that includes:

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and time limits applicable [thereto], including a statement of the claimant's right to bring a civil action under section 502(a) . . . ;

(v) In the case of an adverse benefit determination by . . . a plan providing disability benefits, [i]f an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon . . . and that a copy of [the same] will be provided free of charge to the claimant upon request.

29 C.F.R. § 2560.503–1(g).

Dickerson's complaint appears to reference the February 2004 letter that originally terminated her long-term disability benefits rather than the September 2004 letter that denied her appeal. *See* Pl.'s Mem. in Supp. at 12 (arguing that had Prudential complied with the regulations, Dickerson "might have filed a more effective appeal"). Nonetheless, the Court will address Dickerson's claims with regard to both the February and September 2004 letters.

Dickerson makes two distinct arguments as to why the letters gave deficient notice. First, Dickerson asserts that the letters "did not make any suggestion to Mrs. Dickerson as to what type of information might be helpful in appealing Prudential's determination." Pl.'s Mem. in Supp. at 12. Neither statute nor regulation, however, requires that Prudential do so; instead, the federal regulation only requires that Prudential provide a "description of any additional material or information *necessary* to perfect the claim." 29 C.F.R. § 2560.503–1(g)(iii) (emphasis added); *see also Terry*, 145 F.3d at 39 ("[T]he regulations mandate that the administrator describe what is necessary to 'perfect the claim.' [The plaintiff] has not convinced us that 'perfect the claim' is synonymous with 'win the appeal.'"). Dickerson's complaint is therefore without merit. Nonetheless, this Court notes that both letters did provide Dickerson with the factual bases upon which Prudential based its conclusions. For example, the February 2004 letter explained that Dr. Lotufo indicated that Dickerson could "return to work if accommodated for limited sight," including wearing protective eyewear, as a result of the fact that her right eye was functional and stable with 20/30 vision. Admin. R. at 368–69. It also told Dickerson that a transferable skills analysis and labor market survey had been conducted and found, inter alia, that Dickerson could fulfill the role of a Telephone Sales Representative, which existed in her labor market. *Id.* at 369. This type of information certainly provided Dickerson with an adequate basis upon which she could identify information that would be "helpful" in her appeal.

Second, Dickerson asserts that Prudential "did not tell Mrs. Dickerson that she could receive a copy of Prudential's documents, free of charge." Pl.'s Mem. in Supp. at 12. This, however, is an equally baseless ground for complaint. The only instance in which Prudential would have been required to inform Dickerson that she could obtain copies of information free of charge is "*[i]f* an internal rule, guideline, protocol, or other similar criteron was

relied upon in making the adverse determination" and the written notice itself fails to explain the rule, guideline, protocol, or other criterion. 29 C.F.R. § 2560.503–1(g)(v) (emphasis added). In that instance, Dickerson would be entitled only to free copies of those rules, guidelines, protocols, or other criterions that Prudential actually utilized in evaluating her claim. *See id.* Here, it does not appear that Prudential relied upon any such "internal rule, guideline, protocol, or other similar criterion"; the sole apparent basis for Prudential's decision is the definition of "Total Disability." *See* Def.'s Rebuttal Br. [Doc. 35] at 4 (providing Prudential's assertion to that effect). To the extent that definition can be characterized as an "internal rule, guideline, protocol, or other similar criteron," moreover, Prudential reproduced the definition in both written notices, obviating the need for it to offer a copy of the definition to Dickerson free of charge. Accordingly, the Court rules that both the February and September 2004 notices complied with statutory and regulatory requirements.[12]

### E. Failure to Provide Documents

■ Upon the written request of any plan participant, an administrator shall "furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."[13] 29 U.S.C. § 1024(b)(4). Courts have discretion to award a participant up to $100 a day, or any other remedy deemed necessary, when the administrator refuses to comply with this mandate. *Id.* § 1132(c)(1)(B).

Dickerson asserts that Prudential has violated section 1024(b)(4) by failing to produce four documents that she requested in May 2005. These documents are: (1) the Prudential Claims Management Guidelines or any similar document that assisted Prudential in evaluating Dickerson's claim; (2) Disability Absent and Productivity Training Materials; (3) Long Term Disability Decision Handling; and (4) Prudential's Internal Procedures and Guidelines. Pl.'s Mem. in Supp. at 16. Prudential denies Dickerson's assertion, stating that it twice sent a copy of Dickerson's file to her attorney. Def.'s Mem. in Opp. at 11.

The Court notes that it is difficult to determine whether there is a factual basis for Dickerson's claim. Dickerson requested, in addition to a copy of her file, specific

**12.** The Court also notes that, even if the letters were technically deficient, Dickerson would have to prove actual prejudice in order to be entitled to relief. *See Terry,* 145 F.3d at 39; *Recupero v. New Eng. Tel. & Tel. Co.,* 118 F.3d 820, 825 (1st Cir.1997). It is difficult to see how Dickerson could demonstrate in any event that "a different outcome would have resulted," *Terry,* 145 F.3d at 39, given that the evidence in the record indicates that she is not totally disabled under either provision the Plan's definition of that term.

Furthermore, the Court notes that Dickerson has made no effort to explain what she would have done differently, let alone specifically articulate how she believes it would have made her appeal more effective, had the letters read as she believes they should have. Instead, she simply asserts that "she might have filed a more effective appeal." Mem. in Supp. at 12. This vague, post hoc rationalization is insufficient to demonstrate prejudice. *See DiGregorio v. Pricewaterhouse Coopers Long Term Disability Plan,* 2004 WL 1774566, at *20 (Woodlock, J.) (citing *Terry,* 145 F.3d at 39).

**13.** The Court agrees with Prudential that Dickerson cannot rely upon 29 C.F.R. § 2560.503–1 to show entitlement to these documents. By the plain language of that regulation, it is applicable only to claims for benefits that were filed "on or after January 1, 2002." 29 C.F.R. § 2560.503–1(*o*). Dickerson's claim for benefits was filed in 1999.

classes of documents. It is counterintuitive to believe that these documents, which are internal company documents such as employee training manuals and company procedures and guidelines, would be placed in an individual claimant's file, and Prudential never asserts to the contrary. Thus, Prudential's assertion that it provided Dickerson copies of her file does nothing to respond to her assertion that it also, concurrently, withheld certain types of internal documents from her. At the same time, however, Prudential does generally deny the allegation that it withheld documents.

The Court can resolve the issue, however, despite this ambiguity and the dispute of the parties as to whether the requested documents even fall under the scope of section 1024(b). *See* Def.'s Mem. in Supp. at 13–14; Pl.'s Mem. in Supp. at 17. Dickerson seeks sanctions under section 1132(c)(1), which specifically states that the relief provided for therein is to be awarded "in the court's discretion." 29 U.S.C. § 1132(c)(1). Dickerson, however, can show no entitlement to benefits in the first instance and cannot show that she was harmed by any alleged violation. Even assuming Prudential violated section 1024(b), the Court concludes that granting the requested sanctions in these circumstances would be inappropriate. *See Santana v. Deluxe Corp.*, 12 F.Supp.2d 162, 179 n. 3 (D.Mass.1998) (Freedman, S.J.) ("Even if these allegations [regarding violations of section 1024(b)] were included in the complaint, the Court notes that the plaintiff ... has not shown any indication that he detrimentally relied or was prejudiced by any violations."); *Celi v. Trustees*

*of Pipefitters Local 537 Pension Plan*, 975 F.Supp. 23, 28 (D.Mass.1997) (O'Toole, J.) ("The Court may properly consider prejudice ... as [a] factor[ ] in deciding whether to impose penalties.").

## IV. CONCLUSION

For the foregoing reasons, the Court grants judgment in favor of Prudential.[14]

---

14. The Court notes that Dickerson asserts a claim for breach of contract in count II of the complaint. The parties fail to address this count in their motions for summary judgment. Because, however, this claim obviously relates to Prudential's alleged failure to adhere to the terms of the Boston Globe's group insurance contract, it is preempted by ERISA. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)).